UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

**5 1 0644 WGY**

MAGISTRATE JUDGE _____

| | |
|---|---|
| OMNIPOINT HOLDINGS, INC. )<br><br>    Plaintiff, )<br><br>v. )<br><br>THE TOWN OF BROOKLINE, )<br>TOWN OF BROOKLINE BOARD )<br>OF APPEALS and DIANE R. GORDON, )<br>BAILEY S. SILBERT and ENID )<br>M. STARR, in their capacities as )<br>members of the Town of Brookline )<br>Board of Appeals )<br><br>    Defendants )<br>_____) | CIVIL ACTION NO. _____<br>AMOUNT $ _____<br>SUMMONS ISSUED _____<br>LOCAL RULE 4.1 _____<br>WAIVER FORM _____<br>MCF ISSUED _____<br>BY DPTY CLK. _____<br>DATE _____ |

## COMPLAINT

### INTRODUCTION

This action arises out of the unlawful denial by the Town of Brookline Board of Appeals

("Zoning Board") of an application, pursuant to the Town of Brookline Zoning By-Law ("Zoning

By-Law") by Omnipoint Holdings, Inc. ("Omnipoint") for a special permit to allow Omnipoint

to install panel antennas concealed within a "stealth" flagpole structure to be mounted on an

existing building at the property known and numbered as 1004-1022 West Roxbury Parkway,

Brookline, MA (the "Property"). This denial violates the Federal Telecommunications Act of

1996, 47 U.S.C. § 332. As a result, Omnipoint seeks an injunction from this Court directing the

Zoning Board to grant Omnipoint's application for a special permit and for an injunction and

order of mandamus directing the Town, through its officers and agents, to issue a building permit

## FACTUAL BACKGROUND

### The Personal Communications Service Technology

7.     Omnipoint is a communications venture committed to providing integrated wireless personal communications services by building a national wireless network using PCS technology. PCS technology is a new generation of wireless service that uses digital transmission to improve the services available to consumers.

8.     Unlike cellular services using analog-based systems, PCS digital technology converts voice or data signals into a stream of digits to allow a single radio channel to carry multiple simultaneous signal transmissions. This allows Omnipoint to offer services often unavailable in analog-based systems, such as secured transmissions and enhanced voice, high-speed data, paging and imaging capabilities as well as voice mail, call forwarding and call waiting.

9.     Mobile telephones using PCS technology operate by transmitting a radio signal to antennas mounted on a tower, pole, building, or other structure. The antenna feeds the signal to electronic devices housed in a small equipment cabinet, or base station. The base station is connected by microwave, fiber optic cable, or ordinary telephone wire to the Base Station Controller, subsequently routing the calls throughout the world.

10.     Because the PCS system has a lower signal and a much higher frequency than traditional cellular technology, the range between the PCS mobile telephone and the antennas is limited.

11.     In order to provide continuous service to a PCS telephone user, coverage must overlap in a grid pattern resembling a honeycomb. In the event that Omnipoint is unable to construct a cell site within a specific geographic area, Omnipoint will not be able to provide service to the consumers within that area.

3

12.     Omnipoint's engineers use complex computer programs and extensive field testing to complete a propagation study, which shows where cell sites need to be located in order to provide service. The propagation study also takes into account the topography of the land, the coverage boundaries of neighboring cells and other factors. In order for the entire system to be operational, there must be properly placed cell sites installed and functioning so that seamless coverage can be realized, and only when the entire system is operational will a PCS telephone user have service and an uninterrupted conversation throughout a given territory. If there is no functioning cell site within a given area, there would be no PCS telephone service for customers within that area, and mobile customers who travel into the area will experience blocked calls, in which callers experience an abrupt and complete loss of signal.

13.     Based upon Omnipoint's research and analysis as part of an extensive review of call traffic in the targeted area of Brookline, which targeted area is herein referred to as South Brookline, Omnipoint determined that Omnipoint needed to install panel antennas in the immediate vicinity of the Property in order to fill a significant gap in its coverage.

14.     Indeed, officials of the Town of Brookline had received numerous citizen complaints of a complete lack of coverage for wireless communications in large portions of South Brookline, which is predominantly a residential area.

15.     Because the Zoning By-Law prohibits construction and operation of wireless communication facilities in residential areas within Brookline, the only viable alternative site in the targeted area of South Brookline for construction, installation and operation of a wireless communication facility was at the Property, a retail commercial site in a business zoning district.

16.     Accordingly, Omnipoint sought, through its design and its application, to install three panel antennas within a flagpole structure upon an existing cupola at the Property and to configure the flagpole with the smallest diameter possible to accommodate the antennas, in order

4

that the wireless facility would have no negative aesthetic impact upon the surrounding neighborhood. In addition, Omnipoint sought to install a GPS antenna on the building at the Property, together with equipment cabinets and appurtenant equipment within the building.

**Federal Statutory Control Over PCS Siting**

17.     Section 704 of the Federal Telecommunications Act of 1996 (the "Act"), 47 U.S.C. § 332(c), governs federal, state and local government regulation of the siting of PCS facilities such as the one at issue here.

18.     The Act provides that any person adversely affected by a state or local government's act, or failure to act, that is inconsistent with § 332(c)(7) of the Act may seek expedited review in the federal courts. 47 U.S.C. § 332(c)(7)(B)(v).

**The Request for A Special Permit by Omnipoint**

19.     Under Article 4.09 of the Zoning By-Law, an applicant for a telecommunications facility must apply for special permit from the Zoning Board.

20.     On or about June 1, 2004, Omnipoint submitted its application for a Special Permit to construct and operate a wireless telecommunications facility, as described above, within a "stealth" flagpole upon the existing building at the Property. A true and accurate copy of the Application is attached hereto as Exhibit A.

21.     Following Omnipoint's completion of the design review process before the Town of Brookline Planning Board, mandated by Article 5.09 of the Zoning By-Law, the Zoning Board held a hearing on August 12, 2004, at which time the Zoning Board also heard an application for a special permit for a wireless communication facility to be placed within a separate "stealth" flagpole structure at the Property by Verizon Wireless, another wireless communications provider. A second public hearing was held on December 9, 2004.

22.    At the hearings, Omnipoint presented evidence in the form of testimony by a radio frequency engineer regarding the gap in its coverage and its corresponding need for the antennas it proposed to place within the flagpole structure. Additionally, Omnipoint presented evidence of the lack of alternative sites in the area that would allow it to remedy the gap in its coverage in South Brookline.

23.    In addition, Omnipoint representatives presented evidence concerning the low impact of its design, from both an aesthetic and logistic standpoint, on the neighborhood adjacent to the Property.

24.    At the hearing, testimony was provided by several residents of South Brookline regarding their concern that a) the noise from Verizon's proposed power generator would be disruptive; b) the noise from flags on the flagpoles would be disruptive; c) the coverage provided by the antennas might not rectify the absence of coverage throughout South Brookline; d) they did not like the visual impact of flagpoles, particularly if the flags were illuminated at night.

25.    On March 3, 2005, the Zoning Board voted unanimously to deny Omnipoint's application for a special permit. A true and accurate copy of the Zoning Board decision is attached hereto as Exhibit B.

26.    In its decision, the Board found, without citing any evidence, that a) there are "feasible alternative sites, on Town-owned property"; b) the proposed monopoles "cannot be screened and will have a profound impact upon the contiguous low-density residential districts"; c) the Property is "not an appropriate location for the proposed monopoles"; d) the monopoles would "adversely affect the neighborhood"; and e) Omnipoint's proposal does not solve "the coverage gap in South Brookline".

27.    The Board's findings with respect to the adverse impact of Omnipoint's flagpole on the neighborhood were not supported by the evidence produced at the public hearings.

6

28.    The Board's finding that there are alternative sites on Town-owned property is belied by the fact that the Town has, twice before, failed to grant or allow Omnipoint's proposed construction of wireless communications facilities on Town-owned land and has not, since its denial of Omnipoint's previous proposals, issued a Request for Proposals from wireless carriers with respect to placement of wireless communications facilities that would provide service to South Brookline.

**COUNT I - Violation of the Telecommunications Act of 1996**

29.    Omnipoint hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 28 above as if fully set forth herein.

30.    Article VI, Clause 2, of the United States Constitution, commonly known as the Supremacy Clause, provides, in relevant part, that "[t]his Constitution and the Laws of the United States which shall be made in Pursuance thereof... shall be the Supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

31.    The Act governs the regulation of the placement, construction, and modification of personal wireless service facilities and, under the Supremacy Clause, preempts state laws and municipal ordinances or by-laws affecting such facilities to the extent that such laws, ordinances, and by-laws conflict with the Act.

32.    Omnipoint's application for a special permit constitutes a request to provide "personal wireless services" within the meaning of the Act, and, as such, is entitled to the protection of the Act.

33.    Pursuant to 47 U.S.C. § 332(c)(7)(B)(iii): "Any decision by a State of local government or instrumentality thereof to deny a request to place, construct or modify personal

7

wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."

34.    Omnipoint has fulfilled all of the criteria required by the Zoning By-Law in order to receive a special permit for a telecommunications facility.

35.    Defendants have failed to meet their burden of producing substantial evidence supporting the Zoning Board's denial of Omnipoint's application for a special permit.

36.    Consequently, the Zoning Board's decision violated the Act's prohibition on state or local governments denying the placement, construction and modification of personal wireless service facilities without substantial evidence and a written record. 47 U.S.C. § 332(c)(7)(B)(iii).

37.    In light of the foregoing, the Zoning Board's action is in violation of, and preempted by, the Act and the Supremacy Clause, and should be set aside and enjoined by the Court on that basis.

38.    Pursuant to 47 U.S.C. § 332(c)(7)(B), the "regulation of the placement, construction and modification of personal wireless service facilities by any State or local government or instrumentality thereof …(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services".

39.    Omnipoint has established, and the Town has conceded, that the denial of its request for a special permit to house three panel antennas within a "stealth" flagpole at the Property would result in a significant gap in its provision of wireless communication services to its customers.

40.    There are no alternative sites within the affected area of Brookline on or from which it may otherwise fill its coverage gap; placement of a wireless communications facility on property zoned for residential purposes is prohibited by the By-Law; sites on Town-owned property have either previously been the subject of proposals made by Omnipoint and denied by

the Town, or are situated at the Town-owned Walnut Hills Cemetery, where placement is opposed by the Cemetery Trustees and where the Cemetery's status on the Register of National Historic Sites renders it a highly impractical alternative.

41.     Because of the Town's previous conduct, the constraints on placement embodied in the Zoning By-Law and the non-feasibility and/or impracticality of other sites, further reasonable efforts by Omnipoint would likely be fruitless.

42.     Consequently, the Zoning Board's decision violates the Act's requirement that state or local governments not prohibit or effectively prohibit the provision of personal wireless services.  47 U.S.C. § 332(c)(7)(B)(II).

43.     Accordingly, the Court should exercise its power to issue an order commanding the Zoning Board to grant the special permit for which Omnipoint applied.

**WHEREFORE,** Omnipoint respectfully requests the following relief as against the defendants:

1.     An expedited review of the matters set forth in this Complaint;

2.     An injunction mandating that the Zoning Board grant approval of Omnipoint's request for a special permit;

3.     An injunction and order of mandamus directing the Town, through its officers and agents, to issue a building permit for the construction and installation of three panel antennas within a stealth flagpole to be placed upon the cupola on the building at 1004-1022 West Roxbury Parkway, Brookline, equipment cabinets and a power cabinet to be placed within the building, a GPS antenna to be placed upon the building and any appurtenant equipment necessary for construction, implementation and operation of the wireless telecommunications facility proposed in Omnipoint's application;

9

4.    A judgment that the defendants' actions violated the Act and are therefore void and invalid;

5.    An award of Omnipoint's damages caused by defendants' violation of the Federal Telecommunications Act of 1996;

6.    An award of Omnipoint's costs of suit herein, including reasonable attorneys' fees; and

7.    Such other and further relief as the Court may deem just and proper.


Respectfully submitted,

OMNIPOINT HOLDINGS, INC.

By its attorneys,

William A. Worth, Esq., BBO #544086
Ricardo M. Sousa, Esq. BBO # 565043
Prince, Lobel, Glovsky & Tye LLP
585 Commercial Street
Boston, MA 02109-1024
Tel: (617) 456-8000
Fax: (617) 456-8100

Date:  April 1, 2005

# Town of Brookline, Massachusetts

## Board of Appeals

## APPLICATION FOR SPECIAL PERMIT

## WIRELESS TELECOMMUNICATIONS SERVICES

Project Locus:

1020 West Roxbury Parkway, also known as The Shops at Putterham and numbered 183-189 Grove Street and 1006–1022 West Roxbury Parkway)
Assessor's Map 105, Block 373, Lot 07-09
Zoning District:  L-0.5 Local Business

Applicant:

Omnipoint Holdings, Inc. ("Omnipoint"), a wholly owned subsidiary of T Mobile USA, Inc.
50 Vision Blvd.
East Providence, RI 02914

Property Owner:

Robert Basile, TR
C/O Parkway Centre Trust
40 Williams Street
Brookline, MA 02446

Prepared by:

Ricardo M. Sousa, Esq.
Prince, Lobel, Glovsky & Tye
585 Commercial Street
Boston, MA 02109
Direct:  617-456-8123
Fax:  617-456-8100

# Table of Contents

Tab 1                    Application Forms

Tab 2                    Application Form for Wireless Communications Services

                         Community Environmental Impact Report

                         Support Statements for Special Permit Approval

Tab 3                    Photo Simulations

Tab 4                    Site Locator Maps

Tab 5                    Service Coverage Maps:
                         −  Existing Site Coverage (w/o proposed site) Footprint
                         −  Existing Sites & Proposed Sites Coverage
                         −  Existing Sites with Proposed Site Coverage
                         −  Proposed Site Coverage

                         Affidavit of Radio Frequency Expert

Tab 6                    RF Field Density Report demonstrating compliance with
                         applicable FCC regulations

                         Antenna Specifications

Tab 7                    FCC License

                         NEPA Documentation

Tab 8                    Site Plans

# TOWN OF BROOKLINE
## 333 Washington Street  Brookline, MA  02445
## APPLICATION FOR PLAN EXAMINATION AND BUILDING PERMIT

| | |
|---|---|
| **LOCATION** | 1020 West Roxbury Pkwy, aka Shops at Putterham, and numbered 183-189 Grove Street and 1006-1022 West Roxbury Pkwy |
| | **Zoning District:** L-0.5 Local Business |

**BETWEEN** (No.) (Street) **AND**

**Atlas Page:** 105   **Lot:** 0709   **Block:** 373   **Lot Size:**   **Building Size:**   SqFt

| TYPE OF IMPROVEMENT | USE | Type of Construction |
|---|---|---|
| 1. [ ] New Building | 1. [ ] One Family | 1. [ ] Wood Frame |
| 2. [ ] Addition | 2. [ ] Two or More  Number of Units: | 2. [ ] Masonry |
| 3. [x] Alteration | 3. [ ] Hotel/Motel  Number of Units: | 3. [ ] Structural Steel |
| 4. [ ] Repair/Replacement | 4. [ ] Garage | 4. [ ] Reinforced Concrete |
| 5. [ ] Demolition | 5. [ ] Commerical | 5. [x] Other |
| 6. [ ] Other | 6. [x] Other Wireless Telecommunications | |

**DESCRIPTION OF WORK:** Install panel antennas concealed with "stealth" flagpole structure mounted to existing turret; one GPS antenna mounted to south corner of existing clock tower penthouse; three base transceiver equipment cabinets and one power/telco cabinet installed within existing penthouse; and coaxial cables run internally within flagpole structure connecting panel antennas to base station equipment.

| | |
|---|---|
| **Owners Name: Address:** | Omnipoint Holdings, Inc., a division of T-Mobile USA, Inc.  50 Vision Blvd.  E. Providence, RI 02914 |
| **Phone Number** | 617-456-8123  Ricardo M. Sousa, Esq.  Attorney for Applicant |

| | |
|---|---|
| **Engineer or Architect Name: Address:** | Coler & Colantonio  101 Accord Park Drive  Norwell, MA 02061 |
| **Phone Number** | 781-582-5400 |

**Contractor Name:** TBD   **Phone Number**
**Address:**

**License Number:**   **Expiration Date:**
**Home Improvement Contractors Registration Number:**
**Expiration Date:**

I Herby certify that the proposed work is authorized by the owner of record and that I have been authorized by the owner to make this application as his authorized agent.

| | | |
|---|---|---|
| *(signature)* | 50 Vision Blvd. E. Providence, RI 02914 | |
| **SIGNATURE OF APPLICANT** | **ADDRESS** | **DATE** 6-01-04 |

**No work is to be started untill a permit is in your possession and the job WORK CARD is posted. Applicant is responsible for calling for required inspections as posted on job WORK CARD. JOB WORK CARD "MUST BE RETURNED" TO BUILDING DEPARTMENT.**





# Town of Brookline
## *Massachusetts*

## BUILDING DEPARTMENT REFERRAL
## FOR DESIGN REVIEW CASES

1020 West Roxbury Parkway, aka Shops at Putterham, and numbered 1006-1022 West Roxbury
Parkway and
**Location of Property:** 183-189 Grove Street          **Referral Date:** _____

**Referral for: Sign** _____ **Façade** _____ **Awning** _____ **Wireless Telecomm. Facilities** __X____

**Proposed Business Name:** Omnipoint Holdings, Inc., a **Prior Business Name:** ___N/A_____
division of T-Mobile USA, Inc.

### Contacts for questions and Planning Board meeting notice:

Name (Business Owner): __Omnipoint Holdings, Inc., a division of T-Mobile USA, Inc.__

Address _____          Telephone (____) _____

City _____ State _____ Zip Code _____ Fax (____) _____

e-mail _____

Applicant:
Name (Signmaker or Other): Ricardo M. Sousa, Esq. c/o Omnipoint Holdings, Inc., a division of T-Mobile USA, Inc.

Address 50 Vision Blvd.                    Telephone (617) 456-8123

City East Providence _____ State RI ____ Zip Code 02914 ___ Fax (617) 456-8100

e-mail ___RMSousa@plgt.com_____

**The following items must be included with this application:**
  X   12 color copies of photographs & elevations (existing and proposed)
 N/A  size, style, and color of lettering and background
  X   wireless telecommunication Planning and Community Development application, if relevant
 ____ other: _____

**Also include with this application, if applicable:**
 _x_ site plan    ____ cross-section    ____ color swatch    ____ illumination information    ____ other

**Building Inspector Signature:** _____

| Received by Building Department | Received by Plan. & Comm. Develop. Dept. |
|---|---|
|  |  |

*THIS IS NOT A BUILDING PERMIT APPLICATION.*

## TOWN OF BROOKLINE
## BOARD OF APPEALS
## APPLICATION FOR SPECIAL PERMIT
### (File in Triplicate)

Date  06  /  01  /  04

Name of record owner(s) Robert Basile, Trustee of Parkway Centre Trust

Address      40 Williams Street, Brookline, MA 02446

Deed recorded in the Registry of Deeds, Book_____ Page_____

or registered in the Land Registration Office under Certificate No._____

Location of Property 183-189 Grove Street, Brookline; Block 373, Lot 09
(Street No., Block and Lot No., from current Town Atlas)

Provision(s) of the Zoning By-Law under which a special permit is required (give Article & Section) §4.09 and §9.05

Present use of property (give No. of dwelling units, if any) Retail Shops; No dwelling units

Proposed use of property where applicable, include description of all buildings and facilities, hours of operation, number of employees, whether clients or pupils will come to the house, amount of floor or yard space occupied for accessory uses, number of parking spaces, whether parking fees will be charged, number of dwelling units, etc. (See site plan instructions below) The Applicant proposes to install a wireless antenna facility within a flag-pole design antenna mounting structure to be constructed in the center of the existing turret on the building.  See attached Plans and the Supporting Statements submitted herewith for a more detailed description.

Why does the applicant believe that the proposed use or building will not be detrimental to the neighborhood and will be in harmony with the purposes of the Zoning By-Law?

Town of Brookline, Massachusetts

## APPLICATION FORM FOR
## WIRELESS TELECOMMUNICATIONS SERVICES

Applicant: **Omnipoint Holdings, Inc. ("Omnipoint"), a wholly owned subsidiary of T-Mobile USA, Inc.**
**50 Vision Blvd.**
**East Providence, RI 02914**

Project Locus: **1020 West Roxbury Parkway, also known as The Shops at Putterham and numbered 183-189 Grove Street and 1006–1022 West Roxbury Parkway)**
**Assessor's Map 105, Block 373, Lot 07-09**

Property Owner: **Robert Basile, TR**
**C/O Parkway Centre Trust**
**40 Williams Street**
**Brookline, MA 02446**

## Approval Standards

1. *Please describe the existing conditions of the proposed building/site, including any existing antennas, rooftop utilities, penthouses, etc.*

The project locus a located at 1020 West Roxbury Parkway, also known as The Shops at Putterham and numbered 183-189 Grove Street and 1006–1022 West Roxbury Parkway) and shown on the Town of Brookline Assessor's Map 105, Block 373, Lot 07-09.

Note: Omnipoint Holdings, Inc.'s lease agreement with the subject property owner lists address as 1004-1022 West Roxbury Parkway as described in deed recorded in the Norfolk County Registry of Deeds at Book 590, Page 175.

The proposed site consists of a 61,821 square foot parcel of land located in a L-0.5 Local Business zoning district. The subject site is the only non-residential zoned parcel in the area and is surrounded by residential zoning districts and uses allowed in those districts.

- 1 -

Existing conditions on the locus consists of a single-story, multi-tenant structure operating as a retail shopping plaza with surface parking adjacent to the structure serving the needs of the retail tenants. The roof of the structure is pitched with several dormers and two prominent clock tower turret structures and either end of the primary structure. No antennas or wireless telecommunications equipment are visible on the site. The design of the building shields HVAC, mechanical, and other rooftop equipment from view from West Roxbury Parkway and Grove Street. HVAC equipment is visible from the on-site parking area on the north end of the site.

2. *Please describe the surrounding buildings/area and state whether you are or are not within 50' of residences, hospitals, nursing homes or historical sites, 200' of public school, 600' of a conservation area.*

The locus is bound by Grove Street, Independence Drive, and West Roxbury Parkway. The locus is surrounded by residential zoning districts on all sides. Adjacent uses include residential dwellings, a public library and Temple Emeth. No structures of height in a non-residential zoning district exist anywhere near the vicinity of the project locus.

As per §4.09.6, no portion of Omnipoint's proposed wireless telecommunications facility is...

   − On any of the following structures: residences, public schools, hospitals, nursing homes, or historical sites;
   − Within 50' of any residence, nursing home, or hospital;
   − Within 50' of any historical site;
   − Within within 200' of a public school building or within 600' of a public conservation area (if visible from a conservation area).

3. *Please describe you proposed installation, including dimensions, height above ground or roof, dimension and type of mount, location on ground or roof and setbacks or dimensions for a monopole.*

General Description
Omnipoint Holdings, Inc. (hereinafter referred to as "Omnipoint"), proposes to install three (3) panel antennas within a flagpole-type structure extending above the roof of an existing clock tower structure. Three (3) base transceiver station (BTS) equipment cabinets will be installed within the turret structure concealed from view. Coaxial cables connecting antennas to BTS equipment will run within the flagpole structure concealed from view. One (1) E-911 Global Positioning System (GPS) antenna will be attached to the south corner of the clock tower turret.

Omnipoint has executed a lease agreement with the private owner of the property consisting of an area of approximately 256 square feet within the clock tower turret for proposed equipment.

## Panel Antennas

Each of the three panel antennas measure approximately 72"h X 12"w X 2-1/2"d and will be concealed within a "stealth" flagpole structure facing 30 degrees, 120 degrees, and 270 degrees, respectively, from North to achieve 360 degrees of service coverage.

## Stealth Flagpole Structure

Antennas will be concealed within an antenna mounting structure designed to resemble a flagpole structure. The flagpole will be painted in a non-gloss white. The flagpole structure will be mounted through the center of the clock-tower turret and secured to structural members in the existing building's roof structure. The flagpole will extend 20 feet above the top of the existing clock tower turret roofline, 50 feet above ground level at the base of the primary building structure. The stealth flagpole measures 18" inches in diameter in order to accommodate the dimensions of the internally-mounted antennas, mounting structure and mounting brackets and apparatus. The exterior of the flagpole structure is constructed with RF permeable material enabling the antennas to be concealed without impeding signal propagation.

Under its lease agreement with the owner of subject property, Omnipoint will "provide and install an original all-weather Commonwealth of Massachusetts flag of appropriate size for the flagpole, and in this connection [Omnipoint] will maintain the flag at all times in accordance with the applicable rules and regulations for appropriate flag etiquette, and [Omnipoint] will also install and maintain all necessary lights and related electrical wiring and equipment to conform to flag etiquette." In conforming to such standards, lighting will be installed such that it is directed upward to illuminate the flag and flagpole, and such that it will not be directed at any adjacent dwelling.

## BTS Equipment

BTS equipment consist of three (3) radio base station cabinets measuring approximately 5'h X 4'w X 3'd installed with the interior of the existing clock tower structure concealed from view. Coaxial cables run within the interior of the flagpole will connect antennas to BTS equipment.

## GPS Antenna

A single 12"long X 4"diameter GPS antenna will be attached to the south corner of the clock tower turret and painted to match the building exterior. Placement in this location will provide an unimpeded view of the southern sky, which is required for proper system functioning.

As noted on plans submitted with application materials, all equipment will be installed in a manner that satisfies all ANSI/EIA/TIA-222-F structural standards and state building code requirements. Upon receiving all zoning approvals, detailed construction drawings and structural calculations for the antenna support structure will be prepared by a registered professional engineer and submitted with a building permit application for review and approval by the local building code enforcement official.

Efforts to minimize Visual Impacts

The Applicant has worked closely with the Town's Planning Staff to develop a less obtrusive design. Initially, the Application called for a thicker flag pole (24" in diameter for T-Mobile and 36" in diameter for Verizon) and called for the flagpole to be constructed behind the existing turrets on the building. In order to minimize visual impacts, the Applicant and Verizon have agreed to utilize an 18" flag-pole design and to construct the flag-pole within the existing turret. In addition, the Applicant has agreed to place all of its equipment cabinets within the existing turret, out of the view of the public.

4. *Please describe the zoning relief you believe you need, why it should be granted, and how your proposal meets the goals and criteria described in Section 4.09 of the Zoning By-Law.*

Omnipoint respectfully submits that the proposal complies with the intent and detail of §4.09 of the Zoning By-Lawand, more specifically, with §4.09.6.a.(1-5) and §4.09.6.b as follows:

Proposed antennas are not...

1)  On any of the following structures: residences, public schools, hospitals, nursing homes, or historical sites;
2)  Within 50' of any residence, nursing home, or hospital;
2)  Within 50' of any historical site;
3)  Within 200' of a public school building or within 600' of a public conservation area (if visible from a conservation area).

And...
4)  The proposed building does not contain any dwelling units

As described above, Omnipoint has taken appropriate and reasonable measures in the placement and design of the proposed antennas and equipment to minimize impacts on the surrounding neighborhoods and uses therein. Proposed antennas will be concealed within an enclosure designed to resemble a flagpole structure and BTS equipment will be installed within the existing clock tower turret structure, completely concealed from view. The proposed facility will enable Omnipoint to meet a critical network coverage objective for the South Brookline area through the use of an existing, non-residential structure and employing the least obtrusive design feasible. Omnipoint submits, therefore, that the proposed facility complies with the goals and objectives of §4.09 and the Brookline Zoning By-Law in general.

As the proposed antennas are mounted at a height greater than 10 feet above the roofline, a Special Permit is required in accordance with §4.09.6.c. The proposed facility complies with the standards for special permit approval set forth in §4.09 and §9.05, in addition to Community Environmental Impact standards set forth in §5.09.4.

Please see "<u>Community Environmental Impact Report</u>" and "<u>Support Statements for Special Permit Approval</u>" attached below in this section.

5. *Please describe your method of screening and/or camouflaging; making it blend within the style of the building; and its visibility from the ground or upper floor levels of nearby residences within a radius of 500 feet.*

As detailed on plans submitted herewith, antennas will be fully concealed within a flagpole-style structure mounted on the lower roof directly in the center of the existing clock tower turret and colored in a non-gloss white finish. The flagpole antenna structure extends 20 feet above the existing 30 foot high clock tower turret. The size of the visible portion of the proposed flagpole structure is minimal in relationship to the shopping center as a whole, and not inconsistent with the design features of the building. BTS equipment cabinets will be mounted in the interior of the clock tower concealed from view. Coaxial cables connecting antennas to BTS equipment will run within the interior of the flagpole, also concealed from view. A single 12"long X 4"diameter E-911 GPS antenna will be attached to the south corner of the clock tower turret and painted to match the exterior.

As shown of photo simulations submitted, visibility of the retail shopping center building, and hence the proposed stealth flagpole installation, will be substantially blocked along adjacent ways by the rolling terrain, tree canopy and foliage throughout the area. Moreover, Omnipoint has taken measures to create the least obtrusive design possible to provide the necessary service coverage to this area of Brookline without any need to construct a new free-standing tower. No alternative site, or alternative design, will enable Omnipoint to close the existing gap service with as little impact as the facility proposed under this application.

6. *Please describe your plan for continuous monitoring of emissions.*

Omnipoint's cell sites are monitored remotely on a continuous basis from Omnipoint's New England Network Operations Center located 50 Vision Blvd, East Providence, Rhode Island. Routine daily diagnostics are run from the Network Operations Center and routine on-site diagnostics, monitoring and maintenance are performed one to two times per month by a specialized technician.

As certified in the attached Affidavit of Radio Frequency Expert Ian Hopkins, radio frequency engineer for Omnipoint, the proposed facility will be installed, erected, maintained and used in compliance with all applicable federal and state laws and

regulations, including, but not limited to, radio frequency emissions regulations issued pursuant to the Telecommunications Act of 1996, including all successors to such laws and regulations.

Radio frequency exposure levels from Omnipoint's equipment, under worst-case scenario conditions as defined under FCC OET Bulletin 65, are fully compliant with and, in fact, far below maximum permissible exposure (MPE) levels stipulated under Federal Communications Commission (FCC) regulations (codified under 47CFR §1.1310.

Attached hereto in Section 6 is table of values specifically applicable to predicted exposure levels from Omnipoint's proposed facility. Values specified in columns labeled "Cylindrical in Mainbeam" and "Free Space on Ground" show the percent of MPE limits based on distance from the antenna, with the value of "1" being at the limit for uncontrolled exposure as defined under OET Bulletin 65, and values less than one being below FCC limits. According to this table, at no point on the ground from below the antennas to 63.11 feet from the antennas do exposure levels approach even 1% of the applicable FCC limits in "free space" (ie. with no RF obstructions or attenuating factors such as building materials, foliage, air, etc.), therefore actual exposure levels will be even lower. Hypothetically, a person standing 35' above ground level directly in front of the proposed antenna (note: this is obviously not a realistic scenario, but rather to demonstrate compliance) would be below the FCC exposure limit at any distance greater than 8.51 feet from the antenna. Therefore, exposure levels at any point on the subject property, at the property line, and on all adjacent properties are substantially below applicable FCC limits.

7.  *Please describe the geographic boundary of the coverage area for the proposed facility and the level of service it will provide in terms of dead spot percentage and expected call capacity. (Blocking % based on the Erlang B model.)*

Please see the attached coverage plots, which best illustrate the existing and proposed coverage in this area of Brookline. Specifically, the plot labeled "Coverage Footprint" depicts the predicted coverage from the proposed site alone. The proposed site will remedy a substantial dead spot in the south Brookline area and connect to adjacent cells in Brookline and neighboring cities of Newton and Boston as shown on the plot labeled "Proposed Coverage."

Omnipoint's design objective is to provide a better than 2% blocking Grade of Service to 95% of the coverage objective with minimum signal of -84 dBm.

8.  *Please describe your company's master plan, including other existing and planned facilities within and adjacent to this area of Brookline and in adjoining cities/towns, and any additions, modifications, enhancements, or reductions*

- 6 -

*expected within the next five years and within five to ten years. State your order of priority for the sites and which other sites link up with this site.*

Please refer to attached coverage plots labeled "Existing Coverage" and "Proposed Coverage" depicting Omnipoint's existing and planned cell sites for the Town of Brookline. Please note that both plots show all existing (labeled in black) and planned (labeled in red) sites/coverage for cells adjacent to the proposed site, including adjacent sites in neighboring Boston and Newton.

### Existing Sites in Brookline
910 Boylston - 4BS0385
1200 Beacon Street - 4BS0358
1550 Beacon Street – 4CE3386
209 Harvard Street (Brookline Village) - 4B0S614 (approved by Planning Board 7/23/03)

### Currently Planned Sites in Brookline
South Brookline– 4DE0380 (*Subject Site)
Clyde Lee/Goddard Ave – 4BN0086 (no definitive candidate - adjacent/connecting to subject site)
Boylston St/Cypress St. – 4BS0616 (no definitive candidate)
Boston/Brookline - BU Bridge/Comm. Ave. – 4BS0448 (current site candidates in Boston)
Brookline – 4BN020 – (No definitive candidate)
Boston/Brookline - Washington/Comm. Ave - 4BS0618 (current site candidates in Boston)
Brookline – 4BN0199 (No definitive candidate)
Brookline – 4BN021 (No definitive candidate)
Brookline – 4BN018 (No definitive candidate)
Brookline – 4BN096 – Holly Hood Cemetery

### Adjacent Connecting Sites (Existing and Planned) in Boston and Newton
Boston - Faulkner Hospital (existing)- 4DE2230
Boston - VHW area (planned)- 4DE3387
Boston – Centre St/Highlands area (planned)- 4BN0009
Newton – Rt. 9 (existing)- 4DE3114
Newton – Dedham St. area (planned)- 4BS0563

No additional cell sites are planned at this time. 10-year projections are not available and would be purely speculative due to the ever-changing voice and data services available and variations in subscriber demand and usage patterns. Future voice and data volume may or may not require further expansion or modification of network facilities to facilitate reliable network connectivity. If any additional sites become necessary, Omnipoint will provide information these planned sites in subsequent applications.

9. *List and give amount of the following Fees/Bonds submitted.*

   $_____ *removal bond equal to 20% of equipment and installation costs of proposed antennas & existing obsolete antennas (at discretion of Building Dept.)*

   $_____ *fee to cover maintenance and inventory and monitoring emissions (to be determined by the Building Commissioner, in range of $1,000 to $3,000)*

   $_____ *fee to hire a telecommunications consultant to evaluate proposal (to be determined by the Building Commissioner, in range of $1,000 to $3,000)*

   Omnipoint's lease agreement with the private owner of the subject property explicitly obligates Omnipoint to "promptly remove" all equipment, and if for any reason Omnipoint were to fail to do so, the owner may effect such removal with the associated cost to be paid by Omnipoint. If necessary and required as a condition of permitting, a removal bond of $7,500 in favor of the Town would be furnished upon granting of all necessary permits and would be provided prior to the start of construction.

   It is expected that all other fees, if necessary, such as future monitoring or for a telecommunications specialist, would be paid as a condition of permitting.

10. *Please state level of service related to dead spot and call capacity the company finds acceptable and compare this to the criteria for service area boundaries described in 47 CRF Parts 22 or 24 as applicable.*

    Omnipoint's design objective is to provide a better than 2% blocking Grade of Service to 95% of the coverage objective with minimum signal of -84 dBm. This design objective is focused on providing Omnipoint (T Mobile) subscribers with the ability to use their PCS-based devices in their homes, offices, vehicles, and on the street. Furthermore, reliable connectivity is critical in emergency situations, which can only be facilitated through proper network design providing sufficient signal strength and network capacity. The ability to offer this level of service requires a sufficient number of cell sites within specific geographic areas, and is generally a function of terrain, topography and local zoning regulations. Omnipoint designs its network installations to fit within local zoning regulations to the degree possible while striving to achieve the standards outlined above.

    47 CRF Part 24 §24.236 <u>Field Strength Limits</u> states in its entirety (47 CRF Ch. 1(10-1-02 edition)):

    *"The predicted or measured median field strength at any location on the border of the PCS service area shall not exceed 47 dBu/V/m unless the parties agree to a higher field strength."*

- 8 -

The purpose of this section is to apply a signal level standard at a license coverage boundary determined by a complex formula whereby a license holder provides coverage at the edge of its license area so that it does not interfere with another license holder's operation at the same frequencies in an adjoining area. This is totally inapplicable to the Town of Brookline as there is no applicable license boundary in or adjacent to the Town of Brookline. Omnipoint Holdings, Inc. controls its specific spectrum throughout the Town of Brookline and surrounding area communities.

**11. Please state whether actual measurement and/or modeling of expected radio frequency power density levels will comply with FCC standards regarding safe power density levels in accordance with FCC OET Bulletin No. 65. Show all assumptions and calculations, including effects of all emitters on, or planned to be on, the site. Discuss the results with respect to current state/federal standards for radio frequency exposure.**

Please refer to the Affidavit of Radio Frequency Engineer Ian Hopkins, dated May 27, 2004 and supporting documentation included with enclosed application materials. As attested to in the above-referenced affidavit, the proposed facility will be installed, erected, maintained and used in compliance with all applicable federal and state laws and regulations, including, but not limited to, radio frequency emissions regulations issued pursuant to the Telecommunications Act of 1996, including all successors to such laws and regulations. Radio frequency exposure levels from Omnipoint's proposed facility are fully compliant with and well within maximum permissible exposure levels allowed under Federal Communications Commission (FCC) regulations as specified under FCC OET Bulletin 65.

**12. If antenna height is more than 10' above the roof or a tower that exceeds 100' in height, please explain why the extra height is needed and why alternative methods such as repeaters, micro-cells, or PCS-over-cable could not be used instead.**

The proposed antenna height is 50 feet above the ground elevation at the site, which is 20 feet above the clock tower turret roofline. As shown on coverage plots and attested to in an Affidavit of Radio Frequency Engineer Ian Hopkins, dated May 27 2004, the proposed height is the minimum height necessary to close the existing gap in service due to terrain and topographical features in the area of the site, and further due to the existing tree canopy surrounding the site and throughout surrounding neighborhoods. A facility at any lower height would not be capable of filling the coverage gap nor capable of facilitating reliable "handoffs" to neighboring cells in Omnipoint's network as a remote user travels through the area. At 10 feet (or less) above the roof height, the effective coverage footprint would shrink dramatically due to signal blockage from surrounding trees, structures and the rolling terrain around the site. As a result, additional cell sites would be required – more than otherwise necessary – in order to connect to existing and planned adjacent cells (shown on attached plot labeled "Proposed Coverage."

No alternative technology currently available is feasible to remedy the significant coverage gap area in south Brookline.

Repeaters:  Repeaters are designed primarily for in-building type applications and are not a feasible solution for meeting Omnipoint's coverage objective for the south Brookline area.  Additionally, repeaters require an unimpeded signal path to the donor cell site, which would necessitate installing a repeater(s) on a tower structure in a nearby residential zoning district to overcome the height of the tree canopy and topographical features in the area.  No non-residential zoning districts or structures exist in the general area of the proposed facility, therefore this proposition would be contrary to the intent of the By-Law.  Finally, a repeater does not have a specific E-911 site address and therefore use in an outdoor coverage application of this nature would not be compliant with national E-911 standards.

Microcells:  The use of microcells is an infeasible solution for resolving the significant coverage gap in the area of the proposed site.  Microcells produce a small coverage footprint compared to standard cell sites and are designed for network capacity augmentation in dense urban settings under specific, limited circumstances. No non-residential zoning districts or structures of height exist in the surrounding area of south Brookline, therefore, even if theoretically feasible, multiple "microcells" in place of the proposed facility would have to be installed on new towers in residential zoning districts or upon residential structures (with alterations to achieve the necessary height) in order to fill the existing coverage gap, contrary to the purpose and intent of the By-Law.

PCS-over-cable:  This technology has proven both technically unreliable and economically infeasible.  Further, antennas would have to be installed at intervals on utility poles throughout the "system."  This would require installing antennas upon utility structures located on multiple residential-zoned properties and likely within 50 feet of several residences - contrary to the purpose and intend of the By-Law - in order to cover the same area as would the single installation proposed under this application.

*13. Please describe the current level of service in this geographic area related to dead spot percentage, capacity, high priority locations and submit the appropriate test transmitter results, instrumented vehicular surveys; and/or propagation studies using the same scales and parameters as you use for the proposed site.  Explain why a new site is needed.  Could repeaters be used in conjunction with minimum height base stations to reduce or eliminate excessively large dead spots?*

Omnipoint is currently unable to offer service to the majority of homes and primary travel routes in the expected coverage area of the proposed site.  A subscriber in the area of the proposed site, or traveling through the area, would be unable to reliably access Omnipoint's network, or to maintain a reliable connection to the network.

Please refer to the attached coverage maps: Coverage plot labeled "Coverage Footprint" shows the predicted coverage for Omnipoint's proposed facility to a level of –91dBm. Coverage plot labeled "Existing Coverage" shows the extent of the current area of inadequate coverage in south Brookline with existing, on-air sites in Brookline and in the adjacent communities of Boston and Newton. The plot labeled "Proposed Coverage" shows predicted coverage with all existing and planned sites in Brookline, including the proposed site, and with adjacent existing/planned cell sites in Boston and Newton connecting to the proposed site. As illustrated, with the best technology available to Omnipoint at this time, the proposed site is necessary to close a significant gap in service coverage throughout the south Brookline area.

**14. *Please describe the geographic boundary of the coverage area for the proposed facility and the level of service it will provide related to dead spot percentage and expected capacity (blocked call percentage based on Erlang B model) and submit the appropriate test transmitter results, instrumented vehicular surveys and/or propagation studies. Please identify the propagation model used and all assumption used in the propagation model, including but not limited to antenna type(s), orientation, centerline height above ground level, frequency, effective radiated power per channel, number of channels, and received antenna height.***

Please refer to coverage plots, specifically, plot labeled "Coverage Footprint", which shows the predicted geographic footprint for the proposed facility to a level of –91dBm.

Propagation model used and assumptions:

Propagation model = COST231
Antenna types = EMS DR651902DPQ (qty = 3)
Orientation = 30,150,270
Transmit freq = 1945-1949.8 MHz
ERP/channel=350 Watts
Number of channels = 18
Receive antenna height = ~50'

**15. *Please describe alternative sites you identified and surveyed capable of providing substantially equivalent service, and describe the adequacy of service compared with the proposed site. Support this statement with test transmitter results, instrumented vehicular surveys, and/or propagation studies using the same scales and parameters as for the proposed site. Then give you reasons for choosing the selected site over the alternative sites and compare the impacts of the selected site with alternative sites.***

The subject site is the only non-residential zoned parcel in and around the area of south Brookline. The subject site is surrounded by residential zoning districts and

uses allowed in those districts. Alternative sites in the area that Omnipoint has considered include the Putterham Golf Course site and the adjacent Temple Emeth.

Omnipoint responded to a Request for Proposals for the development of a tower at DPW Garage facility located at 870 Hammond Street, however, ultimately this site was never made available for a wireless communications facility. Additionally, a free-standing tower structure would have to be constructed at the site to provide coverage to the area, while the proposal under this application makes use of an existing commercial structure. Due to the area topography, a facility located at the DPW site could not effectively fill Omnipoint's coverage gap in the South Brookline area, therefore the DPW site could not be considered as a substitute for the proposed facility as it would not provide substantially equivalent coverage to the area of need.

Temple Emeth did not express any interest in leasing to Omnipoint to place a wireless communications facility on its property.

No suitable, available alternatives exist in or near the area upon which Omnipoint can locate a wireless communications facility technically capable of filling the substantial gap in service coverage in its network in the south Brookline area. Omnipoint has designed the proposed facility to minimize impacts by concealing antennas within a flagpole-type structure extending only 20' above an existing clock tower structure on a retail commercial structure. While additional antenna height would certainly broaden the coverage footprint, Omnipoint has limited the antenna height to the minimum amount necessary in order to minimize visual impact to the degree possible. The massing of the clock tower structure rising above the primary roofline will absorb much of the visual impact of the proposed flagpole-type antenna structure.

### 16. *Please describe how the facility will be removed when no longer needed and cost.*

Omnipoint's lease agreement with the private owner of the subject property explicitly obligates Omnipoint to promptly remove all equipment upon cessation of use. If deemed necessary and required as a condition of permitting, a removal bond in favor of the Town will be furnished upon granting of all necessary permits and would be provided prior to the start of construction. The estimated cost for equipment removal is $7,500.

### 17. *Will the facility cause interference with aeronautical communications or radio navigation systems or, if taller then existing structures on a building or a tower, will it be an aviation obstruction or hazard under the criteria of 14 CFR 21?*

The proposed facility will not cause interference with aeronautical communications or radio navigations systems. The location and height of the proposed antenna mounting structure do not require marking or lighting and will not present an aviation obstruction or hazard under the criteria of 14CRF 21.

## COMMUNITY ENVIRONMENTAL IMPACT REPORT

### §5.09.4 Standards

a. *Preservation of Landscape:* Installation and operation of Omnipoint's proposed facility will not consume any land area or for open space. The entire installation is confined to the existing retail commercial structure.

b. *Relation of Buildings to Environment:* The proposed flagpole-type antenna structure will extend 20' above the top of the existing clock tower, which stands approximately 30 feet above ground level. BTS equipment cabinets will be installed within the interior of the clock tower concealed from view. The much larger mass of the existing clock tower extending above the primary roofline will absorb much of the visual impact of the proposed flagpole based on its size and location on the building.

c. *Open Space:* Not applicable to the proposed facility. The entire installation is confined to the existing retail commercial building structure.

d. *Circulation:* The proposed use is unmanned, passive in nature and will not cause any material change in vehicular or pedestrian traffic circulation or flow. Once installed, the proposed facility will require, on average, one to two visits per month by a specialized technician for routine monitoring and maintenance, and ample parking currently exists to accommodate the service vehicle.

e. *Surface Water Drainage:* Not applicable to the proposed facility. The proposed installation is confined entirely to the existing retail commercial structure. No change in impervious surface will result from the installation and operation of the proposed facility.

f. *Utility Service:* The proposed facility requires only standard electric and telephone service. Omnipoint's will utilize utilities and conduit currently existing on site.

g. *Advertising Features:* Not applicable. No exterior signage is required and none is proposed with this application.

h. *Special Features:* There will be no service areas, loading docks, or storage areas.

i. *Safety:* The proposed equipment is secured in a locked area accessible from within the building only. No public access to the equipment is available. BTS cabinets are tamper resistant and monitored remotely for any malfunction on a continuous basis. The installation will not affect the ability to evacuate the building in case of an emergency. Furthermore, the proposed facility will enhance public safety in the south Brookline area by improving public and emergency personnel access to wireless service and enhanced E-911 location services, greatly improving response time in emergency situations.

*j.*  *Heritage:* As shown on the attached NEPA Checklist, the proposed facility will not adversely impact historical resources, including sites listed on the National Register of Historic Places or on Town of Brookline historical sites.

*k.*  *Microclimate:* The installation will not generate any heat, glare, noise, dust, vapor, smoke, fumes nor affect the temperature levels in the area.

*l.*  *Energy Efficiency:* Omnipoint utilizes state-of-the-art equipment that maximizes energy efficiency while minimizing space consumption. The proposed facility requires an uninterrupted direct power supply modulated by the BTS equipment and utilizes standard 200 Amp service from existing utilities at the site.

Town of Brookline, Massachusetts

## SUPPORT STATEMENTS FOR SPECIAL PERMIT APPROVAL

### Section 4.09 of the Town of Brookline Zoning By-Laws

Applicant:    **Omnipoint Holdings, Inc. ("Omnipoint"), a wholly owned subsidiary of T Mobile USA, Inc.**
**50 Vision Blvd.**
**East Providence, RI 02914**

Project Locus:    **1020 West Roxbury Parkway, also known as The Shops at Putterham and numbered 183-189 Grove Street and 1006–1022 West Roxbury Parkway)**
**Assessor's Map 105, Block 373, Lot 07-09**

Property Owner:    **Robert Basile, TR**
**C/O Parkway Centre Trust**
**40 Williams Street**
**Brookline, MA 02446**

Omnipoint Holdings Inc., a wholly owned subsidiary of T Mobile USA, Inc. (hereinafter referred to as "Omnipoint") seeks the approval of the Brookline Board of Appeals (the "Board") for a Special Permit, pursuant to §4.09 (Wireless Telecommunications Services) of the Town of Brookline Zoning By-Law (the "By-Law"), and/or any other relief the Board deems necessary, to install and operate a wireless telecommunications facility at the Project Locus noted above, known as The Shops at Putterham, located in the L-0.5 Local Business zoning district.

§4.09.6.c of the By-Law states:

*"A wireless telecommunications antenna and mount on a building or any related equipment, fixtures, or enclosures exceeding 10 feet above roof height, shall require in all districts a special permit issued by the Board of Appeals, subject to the design review standards set forth below."*

As shown on plans submitted with Omnipoint's application, the proposed flagpole antenna mounting structure extends more than 10 feet above the primary roof height. Accordingly, a Special Permit from the Board of Appeals is required.

Applicable Provisions of Zoning By-Law:
Article IV, §4.09.4.b, §4.09.6.c, §4.09.7.a(2); Article IX, §9.05

Omnipoint respectfully submits that the proposal is in harmony with the general
purposes and intent of the By-Law, and also meets its specific requirements
enumerated in §4.09 (Wireless Telecommunications Services) and §9.05 (Conditions
for Approval of Special Permit) for the following reasons:

### §4.09 – WIRELESS TELECOMMUNICATIONS SERVICES

1. *Purpose*

   *The purpose of this section is to allow the adequate development of wireless
   telecommunications services and at the same time regulate the design and
   location of wireless telecommunications facilities to ensure that demand is
   fulfilled in a manner which preserves the safety, character, appearance, property
   values, natural resources, and historic sites of the Town. The intent of the Town
   of Brookline is to exercise the full rights that §704(a) of the Federal
   Telecommunications Act of 1996, 47 U.S.C. s 332(c) et. seq. confers to localities
   in regulating the siting of antennas. The standards herein are intended to achieve
   the following goals:*


   *encourage location of antennas on existing commercial buildings and structures
   rather than on residential ones or new towers, ...*

   - Omnipoint's wireless telecommunications antennas and related equipment are
     proposed on an existing commercial building in a Local Business (L-0.5)
     zoning district.
   - The subject property is the only non-residential zoned property in the vicinity
     of the project. The proposed wireless facility is not proposed on a residential
     structure, and no new tower is proposed with this application.

   *...mitigate any adverse visual effect through proper design, location and
   screening, ...*

   - The proposed location is an existing multi-tenant retail commercial building
     and the only non-residential zoned property in the vicinity.
   - Antennas will be fully concealed within a "stealth flagpole type structure
     located on the existing turret.
   - The antenna mounting design will minimize the height of new structure
     required to enable Omnipoint to close a significant gap in reliable coverage in
     the Town of Brookline.
   - associated BTS equipment cabinets will be installed within the existing turret
     structure, concealed from view.

- Coaxial cables connecting the antennas to BTS equipment will run internally within the flagpole structure, concealed from view.
- The Applicant has worked closely with the Town's Planning Staff to develop a less obtrusive design. Initially, the Application called for a thicker flag pole (24" in diameter for T-Mobile and 36" in diameter for Verizon) and called for the flagpole to be constructed behind the existing turrets on the building. In order to minimize visual impacts, the Applicant and Verizon have agreed to utilize an 18" flag-pole design and to construct the flag-pole within the existing turret. In addition, the Applicant has agreed to place all of its equipment cabinets within the existing turret, out of the view of the public.

*...encourage co-location where it will minimize visual and other impacts,...*

- The proposed site is an existing retail shopping center accommodating pedestrian and vehicular traffic typically associated with such operations.
- With respect to the design proposed under this application, the retail commercial building site is capable of accommodating wireless telecommunications antennas and related equipment for at least one additional licensed service provider without requiring the construction of a new free-standing tower structure or by making use of a residential structure or site in the area. As such, visual and other impacts will be minimized.

*...and prohibit new towers in districts where they may be incompatible with existing residential uses....*

- The proposed facility will be installed on an existing retail commercial structure in a L-0.5 Local Business zoning district.
- No new tower is proposed with this application.

*Monopoles may be approved in non-residential districts by special permit, only if no other alternative is possible.*

- No monopole tower is proposed with this application.

2. *Scope*

*This §4.09 shall apply to all wireless telecommunication antennas and tower and related equipment, fixtures and enclosures, including any modifications to any of the proceeding, but shall not apply to dish or television antennas which receive and do not transmit; amateur ham radio antennas; citizens band radio antennas; fire, police, ambulance and other safety communication antennas; antennas utilized by the Town for its communications systems; and to antennas to be located on Town-owned property, except that paragraph 4., subparagraph c. of this section shall apply.*

Omnipoint operates under license from the Federal Communications Commission ("FCC") to provide Personal Communications Service (PCS) to the general public to operate, in effect, as a public utility. A copy of Omnipoint's license is included with the attached application materials. Further, the proposed site is a privately-owned commercial property. Accordingly, §4.09 applies to Omnipoint's proposed facility.

6.  *Use Regulations*

No part of the proposed facility is...

1)  On any of the following structures: residences, public schools, hospitals, nursing homes, or historical sites;
2)  Within 50' of any residence, nursing home, or hospital;
3)  Within 50' of any historical site;
4)  Within 200' of a public school building or within 600' of a public conservation area (if visible from a conservation area).

7.  *Approval Standards*

a.  *Façade and Roof Antennas and Related Equipment, Fixtures and Enclosures*

1)  *The following design standards shall apply to all approvals and special permits for wireless telecommunications antennas and related equipment, fixtures and enclosures. They shall be as unobtrusive as possible when viewed from the street and from upper floors of nearby residences. Every effort should be made to have them blend in with the style and color of the building they are located upon and with the surrounding environment and not negatively impact property values or environmentally sensitive areas, such as wetlands or historic sites. Where necessary, screening shall be provided to minimize visible impacts. Items for evaluation during the approval process include color, finish, size, location on building façade or roof, camouflaging, and screening. Greater setback from the edge of a building may be required, if it helps to minimize visual impacts and improves over-all aesthetics.*

−  The locus is a commercial retail shopping center and the only non-residential zoned parcel in or near the vicinity of the project.
−  The proposed facility is carefully designed to be as inobtrusive as feasible while satisfying minimum technical requirements necessary to enable Omnipoint to remedy a significant gap in reliable service coverage that exists in its network in the vicinity of the site.

- The panel antennas will be fully concealed within a flagpole-style structure mounted to the rear portion of an existing clock tower turret structure, blending the proposed antenna facility with the building architecture.
- The flagpole structure will be painted in a non-gloss white.
- The diameter of the flagpole structure (18") is the minimum possible to accommodate the antennas, internal mounting structure and mounting apparatus.
- The Applicant agrees to provide an appropriate flag for the flagpole to be maintained at all times in accordance with the applicable rules and regulations for appropriate flag etiquette.
- The design will enable Omnipoint to achieve the minimum height above ground level necessary to remedy a significant gap in reliable service coverage with the least amount of new structure height possible and without the need to construct a new tower.
- Base station equipment cabinets will be installed within the interior of the existing building and concealed from view.
- Coaxial cables connecting antennas to base station equipment will run within the interior of the flagpole structure to the BTS equipment.
- A single (GPS) antenna will be attached to the south corner of the clock tower turret structure to provide the necessary unimpeded view of the southern sky.
- The proposed design will not have an adverse impact on property values and Omnipoint's NEPA compliance certification, a copy of which is enclosed with application materials, demonstrates that the proposed facility will not have an adverse impact on environmentally sensitive areas, such as wetlands or historic properties.

2) *The Board of Appeals may grant a special permit if an antenna is greater than 10 feet above the roof height, where the applicant can demonstrate that the additional height is necessary for proper functioning of the antenna or to allow a less obtrusive location.*

The affidavit from Omnipoint Radio Frequency Engineer Ian Hopkins, with accompanying coverage maps included with application materials, demonstrate that the proposed antenna height is the minimum height necessary to remedy a significant gap in Omnipoint's network service coverage in the south Brookline area. This minimum height is necessary due to topographical and terrain features in the area of the site and to efficiently and reliably connect to adjacent cells in Omnipoint's network. In addition, tree canopy surrounding the proposed site and predominating in the surrounding residential areas would significantly degrade signal propagation at any lower antenna height.

At any lower antenna height, Omnipoint would require additional cell sites in the area to fill the gap in coverage and to facilitate reliable handoffs to

adjacent cells. However, no suitable non-residential zoned sites exist in the surrounding areas of south Brookline, leaving only residential areas for siting options, contrary to the purpose and intent of the By-Law. By contrast, the proposed facility at the requested antenna height would fill the existing coverage gap as shown on coverage maps with a single facility on a commercial zoned property in harmony with the intent of the By-Law.

    b. *Towers*

        1) *The Board of Appeals may issue a special permit for a monopole only if it is proved that no other alternative is possible to provide adequate wireless communications coverage, such as mounting antennas on existing buildings or structures....*

No free-standing monopole tower is proposed with this application. If approved, the proposed facility, which makes use of an existing commercial structure, will provide Omnipoint with adequate coverage in the area of south Brookline. The proposed site is the only viable, available structure capable of providing the requisite coverage to the area.

    c. *Special Permit Findings*

    *In addition to the special permit findings referred to above, the general conditions for approval of a special permit under §9.05 shall be met.*

## §9.05 – CONDITIONS FOR APPROVAL OF SPECIAL PERMIT

    1. *The Board of Appeals shall not approve any such application for a special permit unless it finds that in its judgment all of the following conditions are met:*

        a. *The specific site is an appropriate location for such a use, structure, or condition.*

The proposal makes use of an existing retail commercial structure in a Local Business zoning district. The proposed site is only non-residential zoned site anywhere near the area of the project, and contains the only viable, available structure capable of supporting the proposed wireless telecommunications equipment without the need to construct a new free-standing monopole structure to remedy a significant gap in Omnipoint's network coverage in the area. The proposed use will require, on average, only one or two visits per month by a technician for routine maintenance/monitoring. Ample parking

exists on the site and no additional parking areas are required to accommodate the proposed use.

b.  *The use as developed will not adversely affect the neighborhood.*

The facility as design will not adversely affect the surrounding neighborhood. The proposed use is compatible with the current retail commercial use. BTS equipment cabinets will be installed within the interior of the clock tower turret structure and concealed from view. Antennas will be concealed within a stealth flagpole-type structure designed to minimize visual impact to the greatest degree possible.

A flag will be provided of appropriate size for the flagpole and maintained at all times in accordance with the applicable rules and regulations for appropriate flag etiquette. In conforming to such standards, lighting will be installed in a manner such that it is directed upward to illuminate the flag and flagpole, and such that it will not be directed at any adjacent dwelling.

c.  *There will be no nuisance or serious hazard to vehicles or pedestrians.*

The proposed facility is unmanned and requires only one or two vehicular trips per month by a technician for routine equipment monitoring/maintenance. The proposed use will not increase vehicular traffic volume, congestion, or impede vehicular flow. The use will not create any hazard to pedestrian traffic impact pedestrian flow. Adequate parking is available on site for a service vehicle, and no additional parking areas or paving will be required. The proposed use will produce no noise, smoke, dust, fumes, odors, glare or effluent of any kind.

d.  *Adequate and appropriate facilities will be provided for the proper operation of the proposed use.*

The proposed facility is unmanned and all equipment is continuously monitored remotely from Omnipoint's network operations center located at 50 Vision Blvd., E. Providence, Rhode Island. All sites in Omnipoint's network are monitored 24 hours per day, 7 days per week. Any malfunctioning of the equipment would be detected in the network operations center and a technician would respond with corrective measures to keep the site functioning correctly. The proposed use will have no impact on municipal services and the only utility requirements are for ordinary electric power and telephone service. The proposed use will facilitate expedited transmittal of emergency call to the Fire and Police departments as part of the

enhanced E-911 service facilitated by the proposed wireless
communications facility.

e.  *The development as proposed will not have a significant adverse effect
on the supply of housing available for low and moderate income
people.*

The proposed facility is unmanned will have no impact on the supply
of housing available for low and moderate income people.

## SUMMARY

Having reviewed the specific impacts and made the specific findings provided and
enumerated above, Omnipoint hereby request that the Board find that the proposal is
in harmony with the purpose and intend of the By-Law, and will not have any adverse
effect for the neighborhood and the Town of Brookline as a whole. The findings are
made in view of the particular unique characteristics of the site and the specifics of
the proposed facility, as detailed above. This Site is the most appropriate location for
the installation and operation of a wireless communications facility, and in fact, the
only suitable, practicable site upon which Omnipoint can locate a wireless
telecommunications facility capable of filling the significant gap in its network
coverage in the area of south Brookline. Additionally, we believe we have taken
careful measures to minimize impact on surrounding neighborhood through
thoughtful siting and design. The Applicant has worked closely with the Town's
Planning Staff to develop an acceptable design. Over time, the Applicant and the
Planning Staff have made improvements to the design in order to minimize the
visibility of the wireless facilities.

For the foregoing reasons, Omnipoint respectfully requests that Board grant the
foregoing zoning relief in the form of a special permit, or such other relief as the
Board deems necessary, and allow the installation and operation of the proposed
wireless communications facility. Omnipoint respectfully submits that the proposal
satisfies the standards for zoning relief a set forth in the Town of Brookline Zoning
By-Laws, as well as Massachusetts General Laws pertaining to zoning.



**T··Mobile·**

Proposed Structure

**4DE-0380-B
183-189 Grove Street
Brookline, MA 02446**

**T··Mobile·**

Proposed Structure



**4DE-0380-B**
**183-189 Grove Street**
**Brookline, MA 02446**





Proposed Structure

4DE-0380-B
183-189 Grove Street
Brookline, MA 02446





Map Scale 1:9600  ( 1" = 800' )

BROOKLIN
GIS
"Mapping Our Communit
http://www.town.brookline.ma.u





# AFFIDAVIT
## Of
## RADIO FREQUENCY EXPERT

The undersigned hereby states the following in support of the application by Omnipoint Holdings, Inc. (hereinafter "OHI") to construct and operate a wireless communications facility at 183-189 Grove Street in the Town of Brookline. OHI will construct a facility which includes 3 panel antennas and related BTS equipment in the Town of Brookline, Massachusetts (hereinafter "site"):

1.      I am a Radio Frequency Engineer for OHI, responsible for radio frequency design in Massachusetts.

2.      The list of my qualifications attached to this affidavit is true, accurate, and complete in all material respects.

3.      I have prepared the radio frequency engineering studies, reports, and computer models with respect to this site. I used a propagation modeling software by Logica named Odyssey. This software calculates frequency strength over distance taking into account geographical and topographical land features and finely tuned with live measured data.

4.      OHI is a communications venture committed to providing wireless communication services using personal communications service (hereinafter "PCS") technology. PCS technology uses digital transmission to improve the services available to OHI's customers. OHI offers advanced voice and data services such as text messaging, Internet browsing and electronic mail. OHI customers utilize OHI's PCS network through the trade name T-Mobile. OHI is a subsidiary of T-Mobile USA, Inc.

5.      In order to meet its obligations, under its FCC licenses, OHI must have in place a system of low-power antenna sites to serve wireless communication handsets and telephones. These antenna sites consist of antennas (mounted on a pole, building or other structure) connected through coaxial cable lines to equipment cabinets located near the antennas. The antennas relay information between communication handsets and radio hardware located in the equipment cabinets. The equipment is then connected to phone lines from which a call can be routed anywhere in the world.

6.      Antenna sites are an integral part of OHI's network. To maintain effective, reliable and uninterrupted service to a communications handset user in a given area, there must be a continuous interconnected series of antenna sites, which overlap in a grid pattern. Additionally, each antenna site must be located within a limited area so that it can properly interact with the surrounding antenna sites and, thereby, provide reliable coverage throughout the area.

7.      In compliance with its FCC licenses, OHI is actively building its PCS network to provide service in Massachusetts/Rhode Island. In order to meet its goal of providing seamless uninterrupted service, OHI must continue to develop additional antenna facility sites and apply for and obtain local governmental approvals to construct such antenna sites, in order to eliminate gaps in service coverage.

8(a).    [USE THIS PARAGRAPH FOR CAPACITY SITES] This site will enable OHI to significantly improve overall quality of its wireless network in this area. As appropriate, it will enable OHI to [describe problem – gap or degradation and drops] to provide reliable indoor or in-vehicle coverage. [Expand as necessary.] Any delays at this point in time will severely curtail OHI's ability to satisfy both the FCC mandated time requirement, and to achieve a market position that will allow it to compete for customers.

1

8.      [USE THIS PARAGRAPH FOR COVERAGE GAP SITES]  Presently, a gap exists in the coverage within this area of South Brookline.  This gap in coverage impacts those who are in or travel through this area of South Brookline.  Furthermore, the gap undermines other nearby facilities preventing them from maximizing the coverage to the area as a whole.

9.      As set forth below, OHI is proposing to locate a wireless communications facility on a Rooftop Coupla.

10.     The Town of Brookline is critical to the overall engineering and technical plan of OHI's network.  This site will connect to adjacent proposed sites in West Roxbury, Rt. 9 and communities surrounding Grove Street and will provide coverage to the businesses and residents of South Brookline.

11.     This site is uniquely suitable for OHI's proposed wireless telecommunications facility.  This site conforms to the narrow search specified by OHI's service area computer model.  Unlike other parcels of land in the area, the site has unique radio frequency characteristics, due to the topography of the site, the height of the proposed structure and its location.

12.     Without a wireless transmission facility located at or near the site, OHI will be unable to provide effective, reliable and uninterrupted coverage to customers within the area surrounding the site and handle the number of customers using its network in this area.  By positioning a site at 183-189 Grove Street in Brookline, OHI will be better able to provide reliable and quality coverage to the citizens of Brookline and in vehicle coverage to the commuters traveling on the main roads through and this area. This site will especially help with OHI's ability to meet the strict mandated E911 service requirements set forth by the FCC.

13.     The radio frequency exposure levels generated by the proposed facility are substantially below the maximum applicable health and safety standards established by the Federal Communications Commission (hereinafter "FCC") and the Massachusetts Department of Public Health (hereinafter "DPH").

14.     Based upon the best radio frequency technology available to OHI at this time, it is my professional opinion that the proposed project is at the minimum height needed to ensure reliable PCS service to area residents, commuters and businesses in accordance with system specifications.

Executed this 27th day of May 2004.


_____

**Ian Hopkins**
**RF Engineer**

Ian Hopkins

## SUMMARY OF QUALIFICATIONS

Five years of RF experience in design, optimization, testing, and expansion of PCS systems using GSM/TDMA technology in 850 and 1900mHz.

## PROFESSIONAL EXPERIENCE

**T-Mobile USA, Inc., Boston**                                               **10/02002 - Present**
Design / Optimization Engineer

Responsible for aspects of Radio Frequency Engineering design and optimization.
- Analyzed Next G DAS system for the Back Bay area of Boston
- Created over 250 search rings in the Boston core area inside Rt. 128 within one month time constraints
- Created Spectral Efficiency plan for Boston core area

**Voicestream Wireless, Washington DC**                                      **10/2001 – 10/02002**
Frequency Planner / Optimization Engineer

Responsible for aspects of Radio Frequency Engineering optimization including:
- System wide retune of over 700 cells utilizing 5/15 reuse.
- Frequency Planning of System by Determining Frequency of proposed sites.
- Eliminated performance issues by individual and group retunes.
- Analyzed antenna downtilts to reduce network interference.
- Maintained accurate frequency plan in Odyssey.
- Optimized cell sites using BSC and Cell parameters.
- Used CNA (Cellular Network Administration) for parameter and frequency changes.
- Rehomed Cells to new BSC's utilizing WinFIOL and CNA.
- Removed and added managed objects using WinFIOL.
- Trouble shoot sites using switch commands, stats, and drive test data.

**Sprint PCS, Knoxville/TN**                                                 **9/2001 – 10/2001**
Field Test Engineer

Responsible for all aspects of Radio Frequency testing including:
- Conducted ETX/MTS swing testing.
- Conducted pre and post ETX/MTS swing network drives.
- Conducted site audits and provided client with status database.
- Assisted in BTS swap from low to high capacity.

**AT&T Wireless Services, Seattle/WA**                                       **6/2000 – 7/2001**
Design Engineer

Responsible for all aspects of Radio Frequency Engineering design including:
- Design of capacity sites in the Seattle market.
- Prepare search areas for capacity, N=5, and quality sites.
- Cell Site Need Determination, Search and Site Acquisition Support.
- Prepare all necessary MPE filings.
- Updated all PCS overlay MPE filings.
- Prepare for and Testify at Town Zoning Board Meetings.
- Approval of WOS 2.0 in building designs.
- Assisted in implementation of a fiber re-rad.
- Assisted in design applications of WOS in building solutions.
- Implementation of Planet into Seattle market.
- 1900 mHz license protection.

**Omnipoint Communications, East Providence/RI**                    **9/1997 – 6/2000**
Design Engineer

Responsible for all aspects of Radio Frequency Engineering design including:
- Design of over 100 sites in Eastern Massachusetts.
- Prepare search areas for expanding coverage.
- Conducting CW test on proposed sites.
- Cell Site Need Determination, Search and Site Acquisition Support.
- Analyze Propagation Model Data and Field Test Data.
- Prepare all necessary filings with MADPH and PCN.
- Prepare for and Testify at Town Zoning Board Meetings.
- Responsible for Xcalibur™ database management.
- Responsible for monthly population calculations.
- Experience in creating and organizing a PlaNet™ site database.
- Experience in model tuning with Xcalibur™, PlaNet™ and Odyssey™.
- Planning and construction drawing review and approval.

Responsible for aspects of Radio Frequency Engineering optimization including:
- Frequency Planning of System by Determining Frequency of proposed sites.
- Determined cell parameters for inter-cell relationships.
- Analyze Field Test Data to implement switch parameter changes.
- Experience in BSC Operations & Management.
- Completed BTS integration and sweep testing.
- Assisted in initial testing and implementation of Frequency hopping.

## EDUCATION

Associate of Science Degree in Computerized Drafting, Johnson & Wales University, 1996 - 1997

## PROFESSIONAL TRAINING

2001  MSI Planet Training, Seattle, WA
2000  Logica Odyssey Training, Dallas, TX
2000  Ericsson E-Tec training, Richardson, TX (Ericsson GSM BSC Operation & Maintenance)
1998  Ericsson E-Tec training, Providence, RI (Ericsson GSM RBS 2000 Operation & Maintenance)

## COMPUTER SKILLS

- Software:     PlaNET, MapInfo, Scoreboard, Odyssey, Xcalibur, CellCAD, Grayson Electronics TX and RX, Visual Basic 6, WinFIOL, OSS/OMCR, Command handler, CNA, TEMS Investigation, Agilent Technologies field test software, and Microsoft Office applications.

- Hardware:     HP E7450A optimization unit, Trimble GPS with DR, Differential GPS, Micro controllers, Programmable Logic Devices, MSAT 2000 in building testing equipment, RSAT 2000 and Comarco test units.



Pwr __ y

| | | |
|---|---|---|
| ERP (Watts) | | 630 |
| Number of Chan | | 6 |
| Freq (MHz) | | 1990 (1219.20cm) |
| H max (ft) | | 40 (182.86cm) |
| H eff (ft) | | 6 |
| Gm (dB) | | |
| P class-max (dBm) | | 47.27 (3.3E+4 mW) |
| total EIRP (Watts) | | 3780 (3.8E+6 mW) |
| Wavelength (ft) | | 0.51 (0.16m) |
| Dist to horiz (miles) | | 10.73 |
| Near Field Boundary (O*d^2/L) (ft) | | 17.49 |
| S at NF boundary (mW/cm²) | | 1.06 |
| Max B (DFW) | | 38.55 |
| Controlled Limit (mW/cm²) | | 5.00 |
| UnControlled Limit (mW/cm²) | | 1.00 |

0.104028483    8.873921346

0.2 ft Steps

41.99 ft
at 17.49 ft
< 2.50 ft

139.96 ft

Distance from Antenna    Power Density (mW/cm²)

| Free space in Mainbeam | Cylindrical in Mainbeam (Recomended By FCC) | Free space on Ground | Controlled Limit (mW/cm²) | Controlled Limit (mW/cm²) | UnControlle d Limit (mW/cm²) |
|---|---|---|---|---|---|
| 0.5 ft (16.66 cm) | 38.5477 | 16.4126 | 0.00 | 2.00 | 5.00 | 1.00 |
| 0.7 ft (21.76 cm) | 38.5477 | 11.8162 | 0.00 | 2.00 | 5.00 | 1.00 |
| 0.9 ft (27.87 cm) | 38.5477 | 9.2334 | 0.00 | 2.00 | 5.00 | 1.00 |
| 1.1 ft (33.97 cm) | 38.5477 | 7.5764 | 0.00 | 2.00 | 5.00 | 1.00 |
| 1.3 ft (40.08 cm) | 38.5477 | 6.4236 | 0.00 | 2.00 | 5.00 | 1.00 |
| 1.5 ft (46.18 cm) | 38.5477 | 5.5753 | 0.00 | 2.00 | 5.00 | 1.00 |
| 1.7 ft (52.28 cm) | 38.5477 | 4.9249 | 0.00 | 2.00 | 5.00 | 1.00 |
| 1.9 ft (58.38 cm) | 38.5477 | 4.4104 | 0.00 | 2.00 | 5.00 | 1.00 |
| 2.1 ft (64.46 cm) | 38.5477 | 3.9932 | 0.00 | 2.00 | 5.00 | 1.00 |
| 2.3 ft (70.54 cm) | 38.5477 | 3.6482 | 0.00 | 2.00 | 5.00 | 1.00 |
| 2.5 ft (76.64 cm) | 38.5477 | 3.358 | 0.00 | 2.00 | 5.00 | 1.00 |
| 2.7 ft (82.74 cm) | 38.5477 | 3.1106 | 0.00 | 2.00 | 5.00 | 1.00 |
| 2.9 ft (88.83 cm) | 38.506 | 2.8971 | 0.00 | 2.00 | 5.00 | 1.00 |
| 3.1 ft (94.93 cm) | 37.9923 | 2.7111 | 0.00 | 2.00 | 5.00 | 1.00 |
| 3.3 ft (101.02 cm) | 37.4786 | 2.5475 | 0.00 | 2.00 | 5.00 | 1.00 |
| 3.5 ft (107.12 cm) | 36.9649 | 2.4025 | 0.00 | 2.00 | 5.00 | 1.00 |
| 3.7 ft (113.22 cm) | 36.4512 | 2.2731 | 0.00 | 2.00 | 5.00 | 1.00 |
| 3.9 ft (119.31 cm) | 35.9376 | 2.157 | 0.0001 | 2.00 | 5.00 | 1.00 |
| 4.1 ft (125.41 cm) | 35.4239 | 2.0521 | 0.0001 | 2.00 | 5.00 | 1.00 |
| 4.3 ft (131.50 cm) | 34.9102 | 1.957 | 0.0001 | 2.00 | 5.00 | 1.00 |
| 4.5 ft (137.60 cm) | 34.3965 | 1.8703 | 0.0001 | 2.00 | 5.00 | 1.00 |
| 4.7 ft (143.70 cm) | 33.8828 | 1.791 | 0.0001 | 2.00 | 5.00 | 1.00 |
| 4.9 ft (149.79 cm) | 33.3691 | 1.7181 | 0.0001 | 2.00 | 5.00 | 1.00 |
| 5.1 ft (155.89 cm) | 32.8555 | 1.6509 | 0.0001 | 2.00 | 5.00 | 1.00 |
| 5.3 ft (161.98 cm) | 32.3418 | 1.5888 | 0.0001 | 2.00 | 5.00 | 1.00 |
| 5.5 ft (168.08 cm) | 31.8281 | 1.5312 | 0.0001 | 2.00 | 5.00 | 1.00 |
| 5.7 ft (174.18 cm) | 31.3144 | 1.4778 | 0.0001 | 2.00 | 5.00 | 1.00 |
| 5.9 ft (180.27 cm) | 30.8007 | 1.4278 | 0.0001 | 2.00 | 5.00 | 1.00 |
| 6.1 ft (186.37 cm) | 30.2871 | 1.3809 | 0.0001 | 2.00 | 5.00 | 1.00 |
| 6.3 ft (192.46 cm) | 29.7734 | 1.3372 | 0.0001 | 2.00 | 5.00 | 1.00 |

| Vertical Pattern | | |
|---|---|---|
| Antenna | EMS DB6S-18-XXDD-Q | |
| BW | 18.5 dBi | |
| Tilt | 4.5 | |
| TR | 0 | |
| Length (ft) | 6.00 | |
| Area (sqft) | 2.95 | |
| Freq (MHz) | 1990 | |
| | Gain | |
| Elev | | G(θ) |
| 90.0 | -21.5 | -40.0 |
| 89.0 | -21.5 | -40.0 |
| 88.0 | -21.5 | -40.0 |
| 87.0 | -21.5 | -40.0 |
| 86.0 | -21.5 | -40.0 |
| 85.0 | -20.5 | -39.0 |
| 84.0 | -19.1 | -37.6 |
| 83.0 | -18.3 | -38.8 |

65

| -17.3 | | -36.8 |
|---|---|---|
| 81.0 | -16.6 | -35.1 |
| 80.0 | -15.9 | -34.4 |
| 79.0 | -15.0 | -33.5 |
| 78.0 | -14.3 | -32.8 |
| 77.0 | -13.8 | -32.3 |
| 76.0 | -13.5 | -32.0 |
| 75.0 | -13.3 | -31.8 |
| 74.0 | -13.3 | -31.8 |
| 73.0 | -13.6 | -32.1 |
| 72.0 | -14.8 | -33.3 |
| 71.0 | -16.4 | -34.9 |
| 70.0 | -18.5 | -37.0 |
| 69.0 | -20.6 | -39.1 |
| 68.0 | -21.3 | -39.8 |
| 67.0 | -18.9 | -37.4 |
| 66.0 | -16.4 | -34.9 |
| 65.0 | -14.2 | -32.7 |
| 64.0 | -12.5 | -31.0 |
| 63.0 | -11.4 | -29.9 |
| 62.0 | -10.9 | -29.4 |
| 61.0 | -10.9 | -29.4 |
| 60.0 | -11.5 | -30.0 |
| 59.0 | -12.1 | -30.6 |
| 58.0 | -11.9 | -30.4 |
| 57.0 | -10.3 | -28.8 |
| 56.0 | -9.2 | -27.7 |
| 55.0 | -5.9 | -24.8 |
| 54.0 | -4.9 | -24.4 |
| 53.0 | -4.1 | -22.6 |
| 52.0 | -4.0 | -22.5 |
| 51.0 | -4.7 | -23.2 |

62.0

Pwr_Co...ty

| | | | | Pwr_Co..ty | | Distance |
|---|---|---|---|---|---|---|
| 1.00 | 5.00 | 2.00 | 0.0001 | 1.2361 | 28.2567 | 6.51 ft (198.66 cm) |
| 1.00 | 5.00 | 2.00 | 0.0001 | 1.2575 | 28.746 | 6.71 ft (204.66 cm) |
| 1.00 | 5.00 | 2.00 | 0.0001 | 1.2211 | 28.3223 | 6.91 ft (210.76 cm) |
| 1.00 | 5.00 | 2.00 | 0.0002 | 1.1988 | 27.7198 | 7.11 ft (216.86 cm) |
| 1.00 | 5.00 | 2.00 | 0.0002 | 1.1544 | 27.205 | 7.31 ft (222.94 cm) |
| 1.00 | 5.00 | 2.00 | 0.0002 | 1.1235 | 26.6913 | 7.51 ft (229.04 cm) |
| 1.00 | 5.00 | 2.00 | 0.0002 | 1.0946 | 26.8939 | 7.71 ft (235.14 cm) |
| 1.00 | 5.00 | 2.00 | 0.0002 | 1.0688 | 26.1776 | 7.91 ft (241.25 cm) |
| 1.00 | 5.00 | 2.00 | 0.0002 | 1.0405 | 25.1602 | 8.11 ft (247.35 cm) |
| 1.00 | 5.00 | 2.00 | 0.0002 | 1.0155 | 25.1602 | 8.31 ft (253.42 cm) |
| 1.00 | 5.00 | 2.00 | 0.0002 | 0.9917 | 24.1229 | 8.51 ft (259.62 cm) |
| 1.00 | 5.00 | 2.00 | 0.0002 | 0.9690 | 23.6052 | 8.71 ft (265.62 cm) |
| 1.00 | 5.00 | 2.00 | 0.0002 | 0.9472 | 23.0695 | 8.91 ft (271.71 cm) |
| 1.00 | 5.00 | 2.00 | 0.0002 | 0.9264 | 22.5818 | 9.11 ft (277.81 cm) |
| 1.00 | 5.00 | 2.00 | 0.0002 | 0.9065 | 22.0661 | 9.31 ft (283.90 cm) |
| 1.00 | 5.00 | 2.00 | 0.0002 | 0.8874 | 21.5544 | 9.51 ft (290.00 cm) |
| 1.00 | 5.00 | 2.00 | 0.0002 | 0.8692 | 21.0408 | 9.71 ft (296.10 cm) |
| 1.00 | 5.00 | 2.00 | 0.0002 | 0.8516 | 20.5271 | 9.91 ft (302.19 cm) |
| 1.00 | 5.00 | 2.00 | 0.0002 | 0.8348 | 20.0134 | 10.11 ft (308.29 cm) |
| 1.00 | 5.00 | 2.00 | 0.0002 | 0.8186 | 20.0271 | 10.31 ft (314.38 cm) |
| 1.00 | 5.00 | 2.00 | 0.0001 | 0.803 | 19.4667 | 10.51 ft (320.48 cm) |
| 1.00 | 5.00 | 2.00 | 0.0001 | 0.788 | 18.984 | 10.71 ft (326.58 cm) |
| 1.00 | 5.00 | 2.00 | 0.0001 | 0.7736 | 18.4723 | 10.91 ft (332.67 cm) |
| 1.00 | 5.00 | 2.00 | 0.0001 | 0.7597 | 17.9587 | 11.11 ft (338.77 cm) |
| 1.00 | 5.00 | 2.00 | 0.0001 | 0.7463 | 17.446 | 11.31 ft (344.86 cm) |
| 1.00 | 5.00 | 2.00 | 0.0001 | 0.7333 | 16.9315 | 11.51 ft (350.96 cm) |
| 1.00 | 5.00 | 2.00 | 0.00 | 0.7208 | 16.4178 | 11.71 ft (357.06 cm) |
| 1.00 | 5.00 | 2.00 | 0.00 | 0.7087 | 15.9035 | 11.91 ft (363.15 cm) |
| 1.00 | 5.00 | 2.00 | 0.00 | 0.697 | 15.3903 | 12.11 ft (369.25 cm) |
| 1.00 | 5.00 | 2.00 | 0.00 | 0.6857 | 14.8776 | 12.31 ft (375.34 cm) |
| 1.00 | 5.00 | 2.00 | 0.00 | 0.6747 | 14.3629 | 12.51 ft (381.44 cm) |
| 1.00 | 5.00 | 2.00 | 0.00 | 0.6641 | 13.8492 | 12.71 ft (387.54 cm) |
| 1.00 | 5.00 | 2.00 | 0.00 | 0.6538 | 13.3356 | 12.91 ft (393.63 cm) |
| 1.00 | 5.00 | 2.00 | 0.00 | 0.6438 | 12.8218 | 13.11 ft (399.73 cm) |
| 1.00 | 5.00 | 2.00 | 0.00 | 0.6342 | 12.3082 | 13.31 ft (405.82 cm) |
| 1.00 | 5.00 | 2.00 | 0.00 | 0.6248 | 11.7945 | 13.51 ft (411.92 cm) |
| 1.00 | 5.00 | 2.00 | 0.0001 | 0.6157 | 11.2808 | 13.71 ft (418.02 cm) |
| 1.00 | 5.00 | 2.00 | 0.0001 | 0.6069 | 10.7671 | 13.91 ft (424.11 cm) |
| 1.00 | 5.00 | 2.00 | 0.0001 | 0.5982 | 10.2534 | 14.11 ft (430.21 cm) |
| 1.00 | 5.00 | 2.00 | 0.0001 | 0.5659 | 9.7397 | 14.31 ft (436.30 cm) |
| 1.00 | 5.00 | 2.00 | 0.0001 | 0.6517 | 9.2281 | 14.51 ft (442.40 cm) |
| 1.00 | 5.00 | 2.00 | 0.0001 | 0.6738 | 8.7124 | 14.71 ft (448.50 cm) |
| 1.00 | 5.00 | 2.00 | 0.0001 | 0.6681 | 8.1987 | 14.91 ft (454.59 cm) |
| 1.00 | 5.00 | 2.00 | 0.0001 | 0.6586 | 7.685 | 15.11 ft (460.69 cm) |
| 1.00 | 5.00 | 2.00 | 0.0001 | 0.6513 | 7.1713 | 15.31 ft (466.78 cm) |
| 1.00 | 5.00 | 2.00 | 0.0001 | 0.6442 | 6.6576 | 15.51 ft (472.88 cm) |
| 1.00 | 5.00 | 2.00 | 0.0002 | 0.6373 | 6.144 | 15.71 ft (478.98 cm) |
| 1.00 | 5.00 | 2.00 | 0.0002 | 0.6306 | 5.6303 | 15.91 ft (485.07 cm) |
| 1.00 | 5.00 | 2.00 | 0.0002 | 0.524 | 5.1166 | 16.11 ft (491.17 cm) |
| 1.00 | 5.00 | 2.00 | 0.0002 | 0.5175 | 4.6029 | 16.31 ft (497.26 cm) |
| 1.00 | 5.00 | 2.00 | 0.0002 | 0.6113 | 4.0892 | 16.51 ft (503.36 cm) |
| 1.00 | 5.00 | 2.00 | 0.0002 | 0.5052 | 3.5755 | 16.71 ft (509.46 cm) |
| 1.00 | 5.00 | 2.00 | 0.0002 | 0.4992 | 3.0619 | 16.91 ft (515.55 cm) |
| 1.00 | 5.00 | 2.00 | 0.0002 | 0.4934 | 2.5482 | 17.11 ft (521.65 cm) |
| 1.00 | 5.00 | 2.00 | 0.0003 | 0.4877 | 2.0345 | 17.31 ft (527.74 cm) |
| 1.00 | 5.00 | | 0.0003 | 0.4821 | 1.5208 | 17.51 ft (533.84 cm) |
| 1.00 | 5.00 | | 0.0003 | 0.4768 | 1.0565 | 17.71 ft (539.94 cm) |
| 1.00 | 5.00 | | 0.0003 | 0.4713 | 1.0089 | 17.91 ft (546.03 cm) |

Pwr_Density

| Depth | col1 | col2 | col3 | | | Value | | Pwr_Density | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | -8.6 | 0.0 | -40.0 | 18.11 ft (602.13 cm) | 0.9067 | 0.4661 | 0.0003 | 5.00 | 1.00 |
| | -7.7 | 10.3 | -40.0 | 18.31 ft (608.22 cm) | 0.9053 | 0.461 | 0.0002 | 5.00 | 1.00 |
| | -8.6 | -8.8 | -11.0 | 18.51 ft (614.32 cm) | 0.9046 | 0.456 | 0.0002 | 5.00 | 1.00 |
| | -11.3 | 7.2 | -11.0 | 18.71 ft (620.42 cm) | 0.9045 | 0.4512 | 0.0002 | 5.00 | 1.00 |
| | -16.7 | 1.8 | -13.0 | 18.91 ft (626.51 cm) | 0.905 | 0.4464 | 0.0002 | 5.00 | 1.00 |
| | -27.6 | -10.3 | -15.0 | 19.11 ft (632.61 cm) | 0.8952 | 0.4417 | 0.0002 | 5.00 | 1.00 |
| | -23.8 | -9.0 | -16.0 | 19.31 ft (638.70 cm) | 0.8976 | 0.4372 | 0.0002 | 5.00 | 1.00 |
| | -5.1 | -4.9 | -17.0 | 19.51 ft (644.80 cm) | 0.8502 | 0.4327 | 0.0002 | 5.00 | 1.00 |
| | -18.7 | -2.5 | -18.0 | 19.71 ft (650.90 cm) | 0.8331 | 0.4283 | 0.0002 | 5.00 | 1.00 |
| | -17.2 | -0.2 | -19.0 | 19.91 ft (656.99 cm) | 0.8164 | 0.4233 | 0.0002 | 5.00 | 1.00 |
| | 13 | 1.3 | -20.0 | 20.11 ft (663.09 cm) | 0.8055 | 0.424 | 0.0002 | 5.00 | 1.00 |
| | -1.5 | -1.5 | -21.0 | 20.31 ft (669.18 cm) | 0.8033 | 0.4198 | 0.0002 | 5.00 | 1.00 |
| | -4.8 | -0.8 | -22.0 | 20.51 ft (675.28 cm) | 0.7846 | 0.4155 | 0.0002 | 5.00 | 1.00 |
| | -23.1 | -4.8 | -23.0 | 20.71 ft (681.38 cm) | 0.7824 | 0.4118 | 0.0002 | 5.00 | 1.00 |
| | -34.7 | -12.0 | -24.0 | 20.91 ft (687.47 cm) | 0.7546 | 0.4076 | 0.0002 | 5.00 | 1.00 |
| | -30.3 | -12.4 | -25.0 | 21.11 ft (693.57 cm) | 0.7402 | 0.4037 | 0.0003 | 5.00 | 1.00 |
| | -31.3 | -12.3 | -26.0 | 21.31 ft (699.66 cm) | 0.7263 | 0.3999 | 0.0003 | 5.00 | 1.00 |
| | -23.4 | -10.9 | -27.0 | 21.51 ft (705.76 cm) | 0.7127 | 0.3961 | 0.0003 | 5.00 | 1.00 |
| | -24.6 | -4.0 | -28.0 | 21.71 ft (711.86 cm) | 0.6965 | 0.3925 | 0.0003 | 5.00 | 1.00 |
| | -16.1 | -2.7 | -29.0 | 21.91 ft (717.95 cm) | 0.6967 | 0.3888 | 0.0003 | 5.00 | 1.00 |
| | -21.2 | -1.9 | -30.0 | 22.11 ft (724.05 cm) | 0.6872 | 0.3853 | 0.0004 | 5.00 | 1.00 |
| | -30.5 | -1.6 | -31.0 | 22.31 ft (730.14 cm) | 0.6821 | 0.3819 | 0.0004 | 5.00 | 1.00 |
| | -16.8 | -4.3 | -32.0 | 22.51 ft (736.24 cm) | 0.6602 | 0.3784 | 0.0004 | 5.00 | 1.00 |
| | -19.4 | -4.3 | -33.0 | 22.71 ft (742.34 cm) | 0.6537 | 0.375 | 0.0004 | 5.00 | 1.00 |
| | -20.4 | -4.3 | -34.0 | 22.91 ft (748.43 cm) | 0.6275 | 0.3717 | 0.0006 | 5.00 | 1.00 |
| | -22.8 | -18.0 | -35.0 | 23.11 ft (754.53 cm) | 0.6166 | 0.3685 | 0.0006 | 5.00 | 1.00 |
| | -33.2 | -19.1 | -36.0 | 23.31 ft (760.62 cm) | 0.606 | 0.3653 | 0.0006 | 5.00 | 1.00 |
| | -35.0 | -19.0 | -37.0 | 23.51 ft (766.72 cm) | 0.5967 | 0.3622 | 0.0006 | 5.00 | 1.00 |
| | -37.6 | -13.4 | -38.0 | 23.71 ft (772.82 cm) | 0.5866 | 0.3591 | 0.0006 | 5.00 | 1.00 |
| | -37.5 | -3.9 | -39.0 | 23.91 ft (778.91 cm) | 0.5707 | 0.356 | 0.0008 | 5.00 | 1.00 |
| | -28.0 | -3.4 | -40.0 | 24.11 ft (785.01 cm) | 0.5681 | 0.3531 | 0.0008 | 5.00 | 1.00 |
| | -31.9 | -3.5 | -41.0 | 24.31 ft (791.10 cm) | 0.5568 | 0.3501 | 0.0008 | 5.00 | 1.00 |
| | -28.0 | -3.9 | -42.0 | 24.51 ft (797.20 cm) | 0.5477 | 0.3473 | 0.001 | 5.00 | 1.00 |
| | -22.1 | -4.3 | -43.0 | 24.71 ft (803.30 cm) | 0.5366 | 0.3444 | 0.001 | 5.00 | 1.00 |
| | -21.4 | -3.1 | -44.0 | 24.91 ft (809.39 cm) | 0.5301 | 0.3416 | 0.001 | 5.00 | 1.00 |
| | -21.8 | -1.9 | -45.0 | 25.11 ft (815.49 cm) | 0.5218 | 0.3389 | 0.001 | 5.00 | 1.00 |
| | -22.3 | -0.4 | -46.0 | 25.31 ft (821.58 cm) | 0.5133 | 0.3362 | 0.001 | 5.00 | 1.00 |
| | -24.9 | -16.1 | -47.0 | 25.51 ft (827.68 cm) | 0.505 | 0.3335 | 0.001 | 5.00 | 1.00 |
| | -28.5 | -4.7 | -48.0 | 25.71 ft (833.78 cm) | 0.4974 | 0.3309 | 0.0008 | 5.00 | 1.00 |
| | -33.8 | -3.4 | -49.0 | 25.91 ft (839.87 cm) | 0.4897 | 0.3284 | 0.0008 | 5.00 | 1.00 |
| | -40.0 | -2.7 | -50.0 | 26.11 ft (845.97 cm) | 0.484 | 0.3258 | 0.0008 | 5.00 | 1.00 |
| | -40.0 | -2.5 | -51.0 | 26.31 ft (852.06 cm) | 0.4821 | 0.3233 | 0.0008 | 5.00 | 1.00 |
| | -40.0 | -17.3 | -52.0 | 26.51 ft (858.16 cm) | 0.4748 | 0.3209 | 0.0008 | 5.00 | 1.00 |
| | -35.6 | -12.8 | -53.0 | 26.71 ft (864.26 cm) | 0.4679 | 0.3184 | 0.0006 | 5.00 | 1.00 |
| | -31.3 | -6.5 | -54.0 | 26.91 ft (870.35 cm) | 0.4586 | 0.3161 | 0.0006 | 5.00 | 1.00 |
| | -27.7 | -4.5 | -55.0 | 27.11 ft (876.45 cm) | 0.4637 | 0.3137 | 0.0006 | 5.00 | 1.00 |
| | -25.0 | -4.5 | -56.0 | 27.31 ft (882.54 cm) | 0.447 | 0.3114 | 0.0006 | 5.00 | 1.00 |
| | -23.2 | -3.4 | -57.0 | 27.51 ft (888.64 cm) | 0.454 | 0.3091 | 0.0006 | 5.00 | 1.00 |
| | -21.9 | -1.7 | -58.0 | 27.71 ft (894.74 cm) | 0.4277 | 0.3069 | 0.0005 | 5.00 | 1.00 |
| | -21.2 | -2.7 | | 27.91 ft (900.83 cm) | 0.4216 | 0.3047 | 0.0005 | 5.00 | 1.00 |
| | -21.5 | -2.1 | | 28.11 ft (906.93 cm) | 0.4155 | 0.3025 | 0.0005 | 5.00 | 1.00 |
| | -22.9 | -3.4 | | 28.31 ft (913.02 cm) | 0.4096 | 0.3003 | 0.0005 | 5.00 | 1.00 |
| | -23.4 | -3.4 | | 28.51 ft (919.12 cm) | 0.4039 | 0.2982 | 0.0005 | 5.00 | 1.00 |
| | -21.9 | -4.3 | | 28.71 ft (925.22 cm) | 0.3962 | 0.2961 | 0.0003 | 5.00 | 1.00 |
| | -22.7 | -4.2 | | 28.91 ft (931.31 cm) | 0.3927 | 0.294 | 0.0003 | 5.00 | 1.00 |
| | -23.8 | -4.3 | | 29.11 ft (937.41 cm) | 0.382 | 0.292 | 0.0003 | 5.00 | 1.00 |
| | -26.0 | -4.5 | | 29.31 ft (943.50 cm) | 0.3788 | 0.29 | 0.0003 | 5.00 | 1.00 |
| | | | | 29.51 ft (949.60 cm) | 0.3717 | 0.2861 | 0.0003 | 5.00 | 1.00 |

Pwr_c...dy

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| -28.8 | -20.0 | -48.0 | 29.71 ft (905.70 cm) | 0.3697 | 0.2842 | 0.0001 | 5.00 | 1.00 |
| -25.1 | -8.0 | -47.0 | 29.91 ft (911.79 cm) | 0.3618 | 0.2823 | 0.0001 | 5.00 | 1.00 |
| -30.1 | -11.6 | -48.0 | 30.11 ft (917.89 cm) | 0.357 | 0.2804 | 0.0001 | 5.00 | 1.00 |
| -31.9 | -13.4 | -49.0 | 30.31 ft (923.98 cm) | 0.3523 | 0.2785 | 0.0001 | 5.00 | 1.00 |
| -33.9 | -15.4 | -70.0 | 30.51 ft (930.08 cm) | 0.3477 | 0.2767 | 0.0001 | 5.00 | 1.00 |
| -35.6 | -17.1 | -71.0 | 30.71 ft (936.18 cm) | 0.3432 | 0.2749 | 0.00 | 5.00 | 1.00 |
| -36.6 | -18.1 | -72.0 | 30.91 ft (942.27 cm) | 0.3388 | 0.2731 | 0.00 | 5.00 | 1.00 |
| -40.0 | -21.0 | -73.0 | 31.11 ft (948.37 cm) | 0.3344 | 0.2714 | 0.00 | 5.00 | 1.00 |
| -40.0 | -21.5 | -74.0 | 31.31 ft (954.46 cm) | 0.328 | 0.2696 | 0.00 | 5.00 | 1.00 |
| -40.0 | -21.5 | -75.0 | 31.51 ft (960.56 cm) | 0.3219 | 0.2679 | 0.0001 | 5.00 | 1.00 |
| -40.0 | -21.5 | -76.0 | 31.71 ft (966.66 cm) | 0.3179 | 0.2662 | 0.0001 | 5.00 | 1.00 |
| -40.0 | -21.2 | -77.0 | 31.91 ft (972.75 cm) | 0.3138 | 0.2646 | 0.0001 | 5.00 | 1.00 |
| -38.1 | -20.6 | -78.0 | 32.11 ft (978.85 cm) | 0.3151 | 0.2629 | 0.0001 | 5.00 | 1.00 |
| -38.3 | -19.9 | -79.0 | 32.31 ft (984.94 cm) | 0.3063 | 0.2613 | 0.0001 | 5.00 | 1.00 |
| -37.2 | -18.4 | -80.0 | 32.51 ft (991.04 cm) | 0.3025 | 0.2597 | 0.0001 | 5.00 | 1.00 |
| -37.0 | -18.7 | -81.0 | 32.71 ft (997.14 cm) | 0.2989 | 0.2581 | 0.0001 | 5.00 | 1.00 |
| -37.6 | -18.8 | -82.0 | 32.91 ft (1003.23 cm) | 0.2953 | 0.2565 | 0.0001 | 5.00 | 1.00 |
| -38.4 | -19.1 | -83.0 | 33.11 ft (1009.33 cm) | 0.2917 | 0.255 | 0.0001 | 5.00 | 1.00 |
| -38.6 | -19.3 | -84.0 | 33.31 ft (1015.42 cm) | 0.2883 | 0.2534 | 0.0001 | 5.00 | 1.00 |
| -38.9 | -20.0 | -85.0 | 33.51 ft (1021.52 cm) | 0.2849 | 0.2519 | 0.0001 | 5.00 | 1.00 |
| -39.2 | -20.4 | -86.0 | 33.71 ft (1027.62 cm) | 0.2815 | 0.2504 | 0.0002 | 5.00 | 1.00 |
| -39.3 | -20.7 | -87.0 | 33.91 ft (1033.71 cm) | 0.2782 | 0.249 | 0.0002 | 5.00 | 1.00 |
| -40.0 | -21.4 | -88.0 | 34.11 ft (1039.81 cm) | 0.275 | 0.2475 | 0.0002 | 5.00 | 1.00 |
| -40.0 | -21.5 | -89.0 | 34.31 ft (1045.90 cm) | 0.2718 | 0.2461 | 0.0002 | 5.00 | 1.00 |
| -40.0 | -21.5 | -90.0 | 34.51 ft (1052.00 cm) | 0.2687 | 0.2446 | 0.0002 | 5.00 | 1.00 |
| -40.0 | -21.5 | -91.0 | 34.71 ft (1058.10 cm) | 0.2656 | 0.2432 | 0.0002 | 5.00 | 1.00 |
| -40.0 | -21.5 | -92.0 | 34.91 ft (1064.19 cm) | 0.2625 | 0.2418 | 0.0002 | 5.00 | 1.00 |
| -40.0 | -21.5 | -93.0 | 35.11 ft (1070.29 cm) | 0.2596 | 0.2405 | 0.0002 | 5.00 | 1.00 |
| -40.0 | -21.5 | -94.0 | 35.31 ft (1076.38 cm) | 0.2567 | 0.2391 | 0.0001 | 5.00 | 1.00 |
| -40.0 | -21.5 | -95.0 | 35.51 ft (1082.48 cm) | 0.2538 | 0.2377 | 0.0001 | 5.00 | 1.00 |
| -40.0 | -21.5 | -96.0 | 35.71 ft (1088.58 cm) | 0.251 | 0.2364 | 0.0001 | 5.00 | 1.00 |
| -40.0 | -21.5 | -97.0 | 35.91 ft (1094.67 cm) | 0.2483 | 0.2351 | 0.0001 | 5.00 | 1.00 |
| -40.0 | -21.5 | -98.0 | 36.11 ft (1100.77 cm) | 0.2465 | 0.2338 | 0.0001 | 5.00 | 1.00 |
| -40.0 | -21.5 | -99.0 | 36.31 ft (1106.86 cm) | 0.2429 | 0.2325 | 0.0001 | 5.00 | 1.00 |
| -40.0 | -21.5 | -100.0 | 36.51 ft (1112.96 cm) | 0.2402 | 0.2312 | 0.0001 | 5.00 | 1.00 |
| -40.0 | -21.5 | -101.0 | 36.71 ft (1119.06 cm) | 0.2378 | 0.23 | 0.0001 | 5.00 | 1.00 |
| -40.0 | -21.5 | -102.0 | 36.91 ft (1125.15 cm) | 0.2351 | 0.2287 | 0.0001 | 5.00 | 1.00 |
| -40.0 | -21.5 | -103.0 | 37.11 ft (1131.25 cm) | 0.2325 | 0.2275 | 0.0001 | 5.00 | 1.00 |
| -40.0 | -21.5 | -104.0 | 37.31 ft (1137.34 cm) | 0.2301 | 0.2263 | 0.0001 | 5.00 | 1.00 |
| -40.0 | -21.5 | -105.0 | 37.51 ft (1143.44 cm) | 0.2278 | 0.2251 | 0.0001 | 5.00 | 1.00 |
| -40.0 | -21.5 | -106.0 | 37.71 ft (1149.54 cm) | 0.2256 | 0.2239 | 0.0001 | 5.00 | 1.00 |
| -40.0 | -21.5 | -107.0 | 37.91 ft (1155.63 cm) | 0.2229 | 0.2227 | 0.0001 | 5.00 | 1.00 |
| -40.0 | -21.5 | -108.0 | 38.11 ft (1161.73 cm) | 0.2206 | 0.2215 | 0.0001 | 5.00 | 1.00 |
| -40.0 | -21.5 | -109.0 | 38.31 ft (1167.82 cm) | 0.2183 | 0.2204 | 0.0001 | 5.00 | 1.00 |
| -40.0 | -21.5 | -110.0 | 38.51 ft (1173.92 cm) | 0.216 | 0.216 | 0.0001 | 5.00 | 1.00 |
| -40.0 | -21.5 | -111.0 | 38.71 ft (1180.02 cm) | 0.2138 | 0.2183 | 0.0001 | 5.00 | 1.00 |
| -40.0 | -21.5 | -112.0 | 38.91 ft (1186.11 cm) | 0.2116 | 0.2138 | 0.0002 | 5.00 | 1.00 |
| -40.0 | -21.5 | -113.0 | 39.11 ft (1192.21 cm) | 0.2095 | 0.2116 | 0.0002 | 5.00 | 1.00 |
| -40.0 | -21.5 | -114.0 | 39.31 ft (1198.30 cm) | 0.2074 | 0.2096 | 0.0002 | 5.00 | 1.00 |
| -40.0 | -21.5 | -115.0 | 39.51 ft (1204.40 cm) | 0.2053 | 0.2074 | 0.0002 | 5.00 | 1.00 |
| -40.0 | -21.5 | -116.0 | 39.71 ft (1210.50 cm) | 0.2032 | 0.2053 | 0.0002 | 5.00 | 1.00 |
| -40.0 | -21.5 | -117.0 | 39.91 ft (1216.59 cm) | 0.2012 | 0.2032 | 0.0002 | 5.00 | 1.00 |
| -40.0 | -21.5 | -118.0 | 40.11 ft (1222.69 cm) | 0.1992 | 0.2012 | 0.0002 | 5.00 | 1.00 |
| -40.0 | -21.5 | -119.0 | 40.31 ft (1228.78 cm) | 0.1973 | 0.1992 | 0.0002 | 5.00 | 1.00 |
| -40.0 | -21.5 | -120.0 | 40.51 ft (1234.88 cm) | 0.1953 | 0.1973 | 0.0004 | 5.00 | 1.00 |
| -40.0 | -21.5 | -121.0 | 40.71 ft (1240.98 cm) | 0.1934 | 0.1953 | 0.0004 | 5.00 | 1.00 |
| -40.0 | -21.5 | -122.0 | 40.91 ft (1247.07 cm) | 0.1915 | 0.1934 | 0.0004 | 5.00 | 1.00 |
| -40.0 | -21.5 | -128.0 | 41.11 ft (1253.17 cm) | 0.1915 | 0.1915 | 0.0004 | 5.00 | 1.00 |

Page 4

Pwr_..._y

| | -21.5 | -40.0 | ft (cm) | value | value | Pwr | 5.00 | 1.00 |
|---|---|---|---|---|---|---|---|---|
| 124.0 | -21.5 | -40.0 | 41.81 ft (1275.29 cm) | 0.1897 | 0.1897 | 0.0004 | 5.00 | 1.00 |
| 125.0 | -21.5 | -40.0 | 41.91 ft (1278.35 cm) | 0.1879 | 0.1879 | 0.0004 | 5.00 | 1.00 |
| 126.0 | -21.5 | -40.0 | 41.71 ft (1271.45 cm) | 0.1861 | 0.1861 | 0.0004 | 5.00 | 1.00 |
| 127.0 | -21.5 | -40.0 | 41.81 ft (1277.85 cm) | 0.1843 | 0.1843 | 0.0004 | 5.00 | 1.00 |
| 128.0 | -21.5 | -40.0 | 42.11 ft (1283.85 cm) | 0.1826 | 0.1826 | 0.0005 | 5.00 | 1.00 |
| 129.0 | -21.5 | -40.0 | 42.31 ft (1289.74 cm) | 0.1808 | 0.1808 | 0.0004 | 5.00 | 1.00 |
| 130.0 | -21.5 | -40.0 | 42.51 ft (1296.64 cm) | 0.1791 | 0.1791 | 0.0004 | 5.00 | 1.00 |
| 131.0 | -21.5 | -40.0 | 42.71 ft (1301.04 cm) | 0.1775 | 0.1775 | 0.0004 | 5.00 | 1.00 |
| 132.0 | -21.5 | -40.0 | 42.91 ft (1305.03 cm) | 0.1758 | 0.1758 | 0.0004 | 5.00 | 1.00 |
| 133.0 | -21.5 | -40.0 | 43.11 ft (1314.13 cm) | 0.1742 | 0.1742 | 0.0004 | 5.00 | 1.00 |
| 134.0 | -21.5 | -40.0 | 43.31 ft (1320.22 cm) | 0.1726 | 0.1726 | 0.0004 | 5.00 | 1.00 |
| 135.0 | -21.5 | -40.0 | 43.51 ft (1326.32 cm) | 0.171 | 0.171 | 0.0004 | 5.00 | 1.00 |
| 136.0 | -21.5 | -40.0 | 43.71 ft (1332.42 cm) | 0.1694 | 0.1694 | 0.0004 | 5.00 | 1.00 |
| 137.0 | -21.5 | -40.0 | 43.91 ft (1338.51 cm) | 0.1679 | 0.1679 | 0.0004 | 5.00 | 1.00 |
| 138.0 | -21.5 | -40.0 | 44.11 ft (1344.61 cm) | 0.1664 | 0.1664 | 0.0004 | 5.00 | 1.00 |
| 139.0 | -21.5 | -40.0 | 44.31 ft (1350.70 cm) | 0.1649 | 0.1649 | 0.0004 | 5.00 | 1.00 |
| 140.0 | -21.5 | -40.0 | 44.51 ft (1356.80 cm) | 0.1634 | 0.1634 | 0.0004 | 5.00 | 1.00 |
| 141.0 | -21.5 | -40.0 | 44.71 ft (1362.90 cm) | 0.1619 | 0.1619 | 0.0004 | 5.00 | 1.00 |
| 142.0 | -21.5 | -40.0 | 44.91 ft (1368.99 cm) | 0.1605 | 0.1605 | 0.0004 | 5.00 | 1.00 |
| 143.0 | -21.5 | -40.0 | 45.11 ft (1375.09 cm) | 0.1591 | 0.1591 | 0.0004 | 5.00 | 1.00 |
| 144.0 | -21.5 | -40.0 | 45.31 ft (1381.18 cm) | 0.1577 | 0.1577 | 0.0004 | 5.00 | 1.00 |
| 145.0 | -21.5 | -40.0 | 45.51 ft (1387.28 cm) | 0.1563 | 0.1563 | 0.0003 | 5.00 | 1.00 |
| 146.0 | -21.5 | -40.0 | 45.71 ft (1393.38 cm) | 0.1549 | 0.1549 | 0.0003 | 5.00 | 1.00 |
| 147.0 | -21.5 | -40.0 | 45.91 ft (1399.47 cm) | 0.1536 | 0.1536 | 0.0003 | 5.00 | 1.00 |
| 148.0 | -21.5 | -40.0 | 46.11 ft (1405.57 cm) | 0.1523 | 0.1523 | 0.0002 | 5.00 | 1.00 |
| 149.0 | -21.5 | -40.0 | 46.31 ft (1411.66 cm) | 0.1509 | 0.1509 | 0.0002 | 5.00 | 1.00 |
| 150.0 | -21.5 | -40.0 | 46.51 ft (1417.76 cm) | 0.1496 | 0.1496 | 0.0002 | 5.00 | 1.00 |
| 151.0 | -21.5 | -40.0 | 46.71 ft (1423.86 cm) | 0.1484 | 0.1484 | 0.0002 | 5.00 | 1.00 |
| 152.0 | -21.5 | -40.0 | 46.91 ft (1429.95 cm) | 0.1471 | 0.1471 | 0.0002 | 5.00 | 1.00 |
| 153.0 | -21.5 | -40.0 | 47.11 ft (1436.05 cm) | 0.1459 | 0.1459 | 0.0001 | 5.00 | 1.00 |
| 154.0 | -21.5 | -40.0 | 47.31 ft (1442.14 cm) | 0.1446 | 0.1446 | 0.0001 | 5.00 | 1.00 |
| 155.0 | -21.5 | -40.0 | 47.51 ft (1448.24 cm) | 0.1434 | 0.1434 | 0.0001 | 5.00 | 1.00 |
| 156.0 | -21.5 | -40.0 | 47.71 ft (1454.34 cm) | 0.1422 | 0.1422 | 0.0001 | 5.00 | 1.00 |
| 157.0 | -21.5 | -40.0 | 47.91 ft (1460.43 cm) | 0.141 | 0.141 | 0.0001 | 5.00 | 1.00 |
| 158.0 | -21.5 | -40.0 | 48.11 ft (1466.53 cm) | 0.1399 | 0.1399 | 0.0001 | 5.00 | 1.00 |
| 159.0 | -21.5 | -40.0 | 48.31 ft (1472.62 cm) | 0.1387 | 0.1387 | 0.0001 | 5.00 | 1.00 |
| 160.0 | -21.5 | -40.0 | 48.51 ft (1478.72 cm) | 0.1376 | 0.1376 | 0.0001 | 5.00 | 1.00 |
| 161.0 | -21.5 | -40.0 | 48.71 ft (1484.82 cm) | 0.1364 | 0.1364 | 0.0001 | 5.00 | 1.00 |
| 162.0 | -21.5 | -40.0 | 48.91 ft (1490.91 cm) | 0.1353 | 0.1353 | 0.0001 | 5.00 | 1.00 |
| 163.0 | -21.5 | -40.0 | 49.11 ft (1497.01 cm) | 0.1342 | 0.1342 | 0.0001 | 5.00 | 1.00 |
| 164.0 | -21.5 | -40.0 | 49.31 ft (1503.10 cm) | 0.1331 | 0.1331 | 0.0001 | 5.00 | 1.00 |
| 165.0 | -21.5 | -40.0 | 49.51 ft (1509.20 cm) | 0.1321 | 0.1321 | 0.0001 | 5.00 | 1.00 |
| 166.0 | -21.5 | -40.0 | 49.71 ft (1515.30 cm) | 0.131 | 0.131 | 0.0001 | 5.00 | 1.00 |
| 167.0 | -21.5 | -40.0 | 49.91 ft (1521.39 cm) | 0.13 | 0.13 | 0.0001 | 5.00 | 1.00 |
| 168.0 | -21.5 | -40.0 | 50.11 ft (1527.49 cm) | 0.1289 | 0.1289 | 0.0001 | 5.00 | 1.00 |
| 169.0 | -21.5 | -40.0 | 50.31 ft (1533.58 cm) | 0.1279 | 0.1279 | 0.0001 | 5.00 | 1.00 |
| 170.0 | -21.5 | -40.0 | 50.51 ft (1539.68 cm) | 0.1269 | 0.1269 | 0.0001 | 5.00 | 1.00 |
| 171.0 | -21.5 | -40.0 | 50.71 ft (1545.78 cm) | 0.1259 | 0.1259 | 0.0001 | 5.00 | 1.00 |
| 172.0 | -21.5 | -40.0 | 50.91 ft (1551.87 cm) | 0.1249 | 0.1249 | 0.0001 | 5.00 | 1.00 |
| 173.0 | -21.5 | -40.0 | 51.11 ft (1557.97 cm) | 0.1239 | 0.1239 | 0.0001 | 5.00 | 1.00 |
| 174.0 | -21.5 | -40.0 | 51.31 ft (1564.06 cm) | 0.123 | 0.123 | 0.0001 | 5.00 | 1.00 |
| 175.0 | -21.5 | -40.0 | 51.51 ft (1570.16 cm) | 0.122 | 0.122 | 0.0001 | 5.00 | 1.00 |
| 176.0 | -21.5 | -40.0 | 51.71 ft (1576.26 cm) | 0.1211 | 0.1211 | 0.0001 | 5.00 | 1.00 |
| 177.0 | -21.5 | -40.0 | 51.91 ft (1582.35 cm) | 0.1201 | 0.1201 | 0.0001 | 5.00 | 1.00 |
| 178.0 | -21.5 | -40.0 | 52.11 ft (1588.45 cm) | 0.1192 | 0.1192 | 0.0001 | 5.00 | 1.00 |
| 179.0 | -21.5 | -40.0 | 52.31 ft (1594.54 cm) | 0.1183 | 0.1183 | 0.0001 | 5.00 | 1.00 |
| 180.0 | -21.5 | -40.0 | 52.51 ft (1600.64 cm) | 0.1174 | 0.1174 | 0.0001 | 5.00 | 1.00 |
| | -21.5 | -40.0 | 52.71 ft (1606.74 cm) | 0.1165 | 0.1165 | 0.0001 | 5.00 | 1.00 |

Pwr_density

| Pos | | | Location | Pwr dens | Pwr dens | | | |
|---|---|---|---|---|---|---|---|---|
| 178.0 | -21.6 | -40.0 | 62.91 ft (1912.89 cm) | 0.1156 | 0.1156 | 0.0001 | 6.00 | 1.00 |
| 177.0 | -21.6 | -40.0 | 63.11 ft (1915.88 cm) | 0.1148 | 0.1148 | 0.0001 | 6.00 | 1.00 |
| 176.0 | -21.6 | -40.0 | 63.31 ft (1922.02 cm) | 0.1139 | 0.1139 | 0.0001 | 6.00 | 1.00 |
| 175.0 | -21.6 | -40.0 | 63.51 ft (1931.12 cm) | 0.1131 | 0.1131 | 0.0001 | 6.00 | 1.00 |
| 174.0 | -21.6 | -40.0 | 63.71 ft (1937.22 cm) | 0.1122 | 0.1122 | 0.0001 | 6.00 | 1.00 |
| 173.0 | -21.6 | -40.0 | 63.91 ft (1943.31 cm) | 0.1114 | 0.1114 | 0.0001 | 6.00 | 1.00 |
| 172.0 | -21.6 | -40.0 | 54.11 ft (1646.41 cm) | 0.1106 | 0.1106 | 0.0001 | 6.00 | 1.00 |
| 171.0 | -21.6 | -40.0 | 54.31 ft (1650.50 cm) | 0.1098 | 0.1098 | 0.0001 | 6.00 | 1.00 |
| 170.0 | -21.6 | -40.0 | 54.51 ft (1661.60 cm) | 0.109 | 0.109 | 0.0001 | 6.00 | 1.00 |
| 169.0 | -21.6 | -40.0 | 54.71 ft (1667.70 cm) | 0.1082 | 0.1082 | 0.0001 | 6.00 | 1.00 |
| 168.0 | -21.6 | -40.0 | 54.91 ft (1673.79 cm) | 0.1074 | 0.1074 | 0.0001 | 6.00 | 1.00 |
| 167.0 | -21.6 | -40.0 | 55.11 ft (1679.88 cm) | 0.1066 | 0.1066 | 0.0001 | 6.00 | 1.00 |
| 166.0 | -21.6 | -40.0 | 55.31 ft (1685.98 cm) | 0.1058 | 0.1058 | 0.0001 | 6.00 | 1.00 |
| 165.0 | -21.6 | -40.0 | 55.51 ft (1692.08 cm) | 0.1051 | 0.1051 | 0.0001 | 6.00 | 1.00 |
| 164.0 | -21.6 | -40.0 | 55.71 ft (1664.18 cm) | 0.1043 | 0.1043 | 0.0001 | 6.00 | 1.00 |
| 163.0 | -21.6 | -40.0 | 55.91 ft (1704.27 cm) | 0.1035 | 0.1035 | 0.0001 | 6.00 | 1.00 |
| 162.0 | -21.6 | -40.0 | 56.11 ft (1710.37 cm) | 0.1028 | 0.1028 | 0.0001 | 6.00 | 1.00 |
| 161.0 | -21.6 | -40.0 | 56.31 ft (1716.46 cm) | 0.1021 | 0.1021 | 0.0001 | 6.00 | 1.00 |
| 160.0 | -21.6 | -40.0 | 56.51 ft (1722.56 cm) | 0.1014 | 0.1014 | 0.0001 | 6.00 | 1.00 |
| 159.0 | -21.6 | -40.0 | 56.71 ft (1728.66 cm) | 0.1007 | 0.1007 | 0.0001 | 6.00 | 1.00 |
| 158.0 | -21.6 | -40.0 | 56.91 ft (1734.75 cm) | 0.10 | 0.10 | 0.00 | 6.00 | 1.00 |
| 157.0 | -21.6 | -40.0 | 57.11 ft (1740.85 cm) | 0.0993 | 0.0993 | 0.00 | 6.00 | 1.00 |
| 156.0 | -21.6 | -40.0 | 57.31 ft (1746.94 cm) | 0.0986 | 0.0986 | 0.00 | 6.00 | 1.00 |
| 155.0 | -21.6 | -40.0 | 57.51 ft (1753.04 cm) | 0.0979 | 0.0979 | 0.00 | 6.00 | 1.00 |
| 154.0 | -21.6 | -40.0 | 57.71 ft (1759.14 cm) | 0.0972 | 0.0972 | 0.00 | 6.00 | 1.00 |
| 153.0 | -21.6 | -40.0 | 57.91 ft (1765.23 cm) | 0.0965 | 0.0965 | 0.00 | 6.00 | 1.00 |
| 152.0 | -21.6 | -40.0 | 58.11 ft (1771.33 cm) | 0.0959 | 0.0959 | 0.00 | 6.00 | 1.00 |
| 151.0 | -21.6 | -40.0 | 58.31 ft (1777.42 cm) | 0.0952 | 0.0952 | 0.00 | 6.00 | 1.00 |
| 150.0 | -21.6 | -40.0 | 58.51 ft (1783.52 cm) | 0.0946 | 0.0946 | 0.00 | 6.00 | 1.00 |
| 149.0 | -21.6 | -40.0 | 58.71 ft (1789.62 cm) | 0.0939 | 0.0939 | 0.00 | 6.00 | 1.00 |
| 148.0 | -21.6 | -40.0 | 58.91 ft (1795.71 cm) | 0.0933 | 0.0933 | 0.00 | 6.00 | 1.00 |
| 147.0 | -21.6 | -40.0 | 59.11 ft (1801.81 cm) | 0.0927 | 0.0927 | 0.00 | 6.00 | 1.00 |
| 146.0 | -21.6 | -40.0 | 59.31 ft (1807.90 cm) | 0.092 | 0.092 | 0.00 | 6.00 | 1.00 |
| 145.0 | -21.6 | -40.0 | 59.51 ft (1814.00 cm) | 0.0914 | 0.0914 | 0.00 | 6.00 | 1.00 |
| 144.0 | -21.6 | -40.0 | 59.71 ft (1820.10 cm) | 0.0908 | 0.0908 | 0.00 | 6.00 | 1.00 |
| 143.0 | -21.6 | -40.0 | 59.91 ft (1826.19 cm) | 0.0902 | 0.0902 | 0.00 | 6.00 | 1.00 |
| 142.0 | -21.6 | -40.0 | 60.11 ft (1832.29 cm) | 0.0896 | 0.0896 | 0.00 | 6.00 | 1.00 |
| 141.0 | -21.6 | -40.0 | 60.31 ft (1838.38 cm) | 0.089 | 0.089 | 0.00 | 6.00 | 1.00 |
| 140.0 | -21.6 | -40.0 | 60.51 ft (1844.48 cm) | 0.0884 | 0.0884 | 0.00 | 6.00 | 1.00 |
| 139.0 | -21.6 | -40.0 | 60.71 ft (1850.58 cm) | 0.0878 | 0.0878 | 0.0001 | 6.00 | 1.00 |
| 138.0 | -21.6 | -40.0 | 60.91 ft (1856.67 cm) | 0.0873 | 0.0873 | 0.0001 | 6.00 | 1.00 |
| 137.0 | -21.6 | -40.0 | 61.11 ft (1862.77 cm) | 0.0867 | 0.0867 | 0.0001 | 6.00 | 1.00 |
| 136.0 | -21.6 | -40.0 | 61.31 ft (1868.86 cm) | 0.0861 | 0.0861 | 0.0001 | 6.00 | 1.00 |
| 135.0 | -21.6 | -40.0 | 61.51 ft (1874.96 cm) | 0.0856 | 0.0856 | 0.0001 | 6.00 | 1.00 |
| 134.0 | -21.6 | -40.0 | 61.71 ft (1881.06 cm) | 0.085 | 0.085 | 0.0001 | 6.00 | 1.00 |
| 133.0 | -21.6 | -40.0 | 61.91 ft (1887.15 cm) | 0.0845 | 0.0845 | 0.0001 | 6.00 | 1.00 |
| 132.0 | -21.6 | -40.0 | 62.11 ft (1893.25 cm) | 0.0839 | 0.0839 | 0.0001 | 6.00 | 1.00 |
| 131.0 | -21.6 | -40.0 | 62.31 ft (1899.34 cm) | 0.0834 | 0.0834 | 0.0001 | 6.00 | 1.00 |
| 130.0 | -21.6 | -40.0 | 62.51 ft (1905.44 cm) | 0.0834 | 0.0834 | 0.0001 | 6.00 | 1.00 |
| 129.0 | -21.6 | -40.0 | 62.71 ft (1911.54 cm) | 0.0828 | 0.0828 | 0.0001 | 6.00 | 1.00 |
| 128.0 | -21.6 | -40.0 | 62.91 ft (1917.63 cm) | 0.0823 | 0.0823 | 0.0001 | 6.00 | 1.00 |
| 127.0 | -21.6 | -40.0 | 63.11 ft (1923.73 cm) | 0.0818 | 0.0818 | 0.0001 | 6.00 | 1.00 |
| 126.0 | -21.6 | -40.0 | | 0.0813 | 0.0813 | 0.0001 | 6.00 | 1.00 |
| 125.0 | -21.6 | -40.0 | | | | | 6.00 | 1.00 |
| 124.0 | -21.6 | -40.0 | | | | | 6.00 | 1.00 |
| 123.0 | -21.6 | -40.0 | | | | | 6.00 | 1.00 |
| 122.0 | -21.6 | -40.0 | | | | | 6.00 | 1.00 |
| 121.0 | -21.6 | -40.0 | | | | | | |

PWr_c...ay

| DEGREES | | |
| --- | --- | --- |
| 120.0 | -21.5 | -40.0 |
| 119.0 | -21.5 | -40.0 |
| 118.0 | -21.5 | -40.0 |
| 117.0 | -21.5 | -40.0 |
| 116.0 | -21.5 | -40.0 |
| 115.0 | -21.5 | -40.0 |
| 114.0 | -21.5 | -40.0 |
| 113.0 | -21.5 | -40.0 |
| 112.0 | -21.5 | -40.0 |
| 111.0 | -21.5 | -40.0 |
| 110.0 | -21.5 | -40.0 |
| 109.0 | -21.5 | -40.0 |
| 108.0 | -21.5 | -40.0 |
| 107.0 | -21.5 | -40.0 |
| 106.0 | -21.5 | -40.0 |
| 105.0 | -21.5 | -40.0 |
| 104.0 | -21.5 | -40.0 |
| 103.0 | -21.5 | -40.0 |
| 102.0 | -21.5 | -40.0 |
| 101.0 | -21.5 | -40.0 |
| 100.0 | -21.5 | -40.0 |
| 99.0 | -21.5 | -40.0 |
| 98.0 | -21.5 | -40.0 |
| 97.0 | -21.5 | -40.0 |
| 96.0 | -21.5 | -40.0 |
| 95.0 | -21.5 | -40.0 |
| 94.0 | -21.5 | -40.0 |
| 93.0 | -21.5 | -40.0 |
| 92.0 | -21.5 | -40.0 |
| 91.0 | -21.5 | -40.0 |



| ANTENNA | 5800058010 | |
| --- | --- | --- |
| PATTERN | E | |
| DEGREES | 6.6 | |
| NO/UNIT | .. | |
| FRONT-TO-BACK | 21.5 | dB |
| MAXIMUM | 15 | dBd |
| FREQUENCY | 1920 | MHz |



# DR65-19-XXDPQ

## Dual DualPol® Polarization
### 1850 MHz - 1990 MHz

**OptiRange™**



RF CONNECTORS

## Electrical Specifications

| | |
|---|---|
| Azimuth Beamwidth (-3 dB) | 65° |
| Elevation Beamwidth (-3 dB) | 4.5° |
| Gain | 18.5 dBi (16.4 dBd) |
| Polarization | Quad Linear, Slant (± 45°) |
| Port-to-Port Isolation | ≥ 30 dB |
| Front-to-Back Ratio | ≥ 35 dB |
| Electrical Downtilt Options | 0°, 2°, 4°, 6° |
| VSWR | 1.35:1 Max |
| Connectors | 4; 7-16 DIN (female) |
| Power Handling | 250 Watts CW |
| Passive Intermodulation | ≤ -150 dBc |
| | [2 x 20W (+ 43 dBm)] |
| Lightning Protection | Chassis Ground |

## Mechanical Specifications

| | |
|---|---|
| Dimensions (L x W x D) | 72 in x 12 in x 4 in |
| | (182.9 cm x 30.5 cm x 10.2 cm) |
| Rated Wind Velocity | 130 mph (209 km/hr) |
| Equivalent Flat Plate Area | 6 ft² (.56 m²) |
| Front Wind Load @ 100 mph (161 kph) | 173 lbs (768 N) |
| Side Wind Load @ 100 mph (161 kph) | 58 lbs (256 N) |
| Weight | 32 lbs (15 kg) |



## Mounting Options

MTG-P00-10, MTG-S02-10, MTG-DXX-20*, MTG-CXX-10*, MTG-C02-10, MTG-TXX-10*

*Note: *Model number shown represents a series of products.  See Mounting Options section for specific model number.*

## Patterns



| Azimuth | Elevation 0° Downtilt | Elevation 2° Downtilt | Elevation 4° Downtilt | Elevation 6° Downtilt |

Revised 05/07/02



   This appendix summarizes the policies, guidelines and requirements that were adopted by the FCC on August 1, 1996, amending Part 1 of Title 47 of the Code of Federal Regulations, and further amended by action of the Commission on August 25, 1997 (see 47 CFR Sections 1.1307(b), 1.1310, 2.1091 and 2.1093, as amended). Commission actions granting construction permits, licenses to transmit or renewals thereof, equipment authorizations or modifications in existing facilities, require the preparation of an Environmental Assessment (EA), as described in 47 CFR Section 1.1311, if the particular facility, operation or transmitter would cause human exposure to levels of radiofrequency (RF) electromagnetic fields in excess of these limits. For exact language, see the relevant FCC rule sections.

   FCC implementation of the new guidelines for mobile and portable devices became effective August 7, 1996. For other applicants and licensees a transition period was established before the new guidelines would apply. With the exception of the Amateur Radio Service, the date established for the end of the transition period is October 15, 1997. Therefore, the new guidelines will apply to applications filed on or after this date. For the Amateur Service only, the new guidelines will apply to applications filed on or after January 1, 1998.

## Summary of Station and Transmitter Requirements

   Applications to the Commission for construction permits, licenses to transmit or renewals thereof, equipment authorizations or modifications in existing facilities must contain a statement or certification confirming compliance with the limits unless the facility, operation, or transmitter is categorically excluded from routine evaluation, as discussed below. Technical information showing the basis for this statement must be submitted to the Commission upon request.

   The FCC-adopted limits for Maximum Permissible Exposure (MPE) are generally based on recommended exposure guidelines published by the National Council on Radiation Protection and Measurements (NCRP) in "Biological Effects and Exposure Criteria for Radiofrequency Electromagnetic Fields," NCRP Report No. 86, Sections 17.4.1, 17.4.1.1, 17.4.2 and 17.4.3. Copyright NCRP, 1986, Bethesda, Maryland 20814. In the frequency range from 100 MHz to 1500 MHz, exposure limits for field strength and power density are also generally based on the MPE limits found in Section 4.1 of , "IEEE Standard for Safety

Levels with Respect to Human Exposure to Radio Frequency Electromagnetic Fields, 3 kHz to 300 GHz," ANSI/IEEE C95.1-1992, Copyright 1992 by the Institute of Electrical and Electronics Engineers, Inc., New York, New York 10017, and approved for use as an American National Standard by the American National Standards Institute (ANSI).

The FCC's MPE limits for field strength and power density are given in Table 1 (and in 47 CFR § 1.1310)  Figure 1 is a graphical representation of the limits for plane-wave (far-field) equivalent power density versus frequency.  The FCC's limits are generally applicable to *all* facilities, operations and  transmitters regulated by the Commission, and compliance is expected with the appropriate guidelines.  However, *routine* determination of compliance with these exposure limits (routine environmental evaluation), and preparation of an EA if the limits are exceeded, is required only for facilities, operations and transmitters that fall into the categories listed in Table 2, or those specified below under the headings "mobile," "unlicensed" or "portable" devices.  All other facilities, operations and transmitters are categorically excluded from routine evaluation or preparing an EA for RF emissions, except that the Commission may, on its own merits or as the result of a petition, complaint or inquiry, require RF environmental evaluation of transmitters or facilities even though they are otherwise excluded [see 47 CFR Sections 1.1307(c) and (d)].

For purposes of Table 2, the term "building-mounted antennas" means antennas mounted in or on a building structure that is occupied as a workplace or residence.  The term "power" in column 2 of Table 2 refers to total operating power of the transmitting operation in question in terms of effective radiated power (ERP), equivalent isotropically radiated power (EIRP), or peak envelope power (PEP), as defined in 47 CFR. § 2.1.  For the case of the Cellular Radiotelephone Service, 47 CFR § 22, Subpart H, the Personal Communications Service, 47 CFR § 24, and Specialized Mobile Radio Service, 47 CFR § 90, the phrase "total power of all channels" in column 2 of Table 2 means the sum of the ERP or EIRP of all co-located simultaneously operating transmitters owned and operated by a single licensee.

When applying the criteria of Table 2, radiation in all directions should be considered. For the case of transmitting facilities using sectorized transmitting antennas, applicants and licensees should apply the criteria to all transmitting channels in a given sector, noting that for a highly directional antenna there is relatively little contribution to ERP or EIRP summation for other directions.

For purposes of calculating EIRP of an MDS station, the power level refers to the cumulative EIRP of all channels. Further, this power limit assumes conventional NTSC transmissions with 10% aural power, and refers to peak visual power. MDS stations employing other than NTSC transmissions, e.g., digital transmissions, must apply the appropriate NTSC peak visual to average power conversion factor for their modulation scheme in order to determine whether the EIRP power criteria is exceeded.

In general, as specified in 47 C.F.R. 1.1307(b), as amended, when the FCC's guidelines are exceeded *in an accessible area* due to the emissions from multiple fixed transmitters the following policy applies.  Actions necessary to bring the area into compliance

65

with the guidelines are the shared responsibility of *all* licensees whose transmitter's contribution to the RF environment *at the non-complying area* exceeds 5% of the exposure limit (that applies to their particular transmitter) in terms of power density or the square of the electric or magnetic field strength. This applies regardless of whether such transmitters would, by themselves, normally be excluded from performing a routine environmental evaluation. Owners of transmitter sites are expected to allow applicants and licensees to take reasonable steps to comply with the FCC's requirements and, where feasible, should encourage co-location of transmitters and common solutions for controlling access to areas where the RF exposure limits might be exceeded.

The following policy applies in the case of an application for a proposed transmitter, facility or modification (not otherwise excluded from performing a routine RF evaluation) that would *cause non-compliance* at an accessible area previously in compliance. In such a case, it is the responsibility of the applicant to submit an EA if emissions from the applicant's transmitter or facility would cause non-compliance at the area in question. However, this applies only if the applicant's transmitter causes exposure levels at the area in question that exceed 5% of the exposure limits applicable to that particular transmitter in terms of power density or the square of the electric or magnetic field strength.

For a renewal applicant whose transmitter or facility (not otherwise excluded from routine evaluation) contributes to the RF environment at an accessible area *not in compliance* with the guidelines the following policy applies. The renewal applicant must submit an EA if emissions from the applicant's transmitter or facility, at the area in question, result in exposure levels that exceed 5% of the exposure limits applicable to that particular transmitter in terms of power density or the square of the electric or magnetic field strength. In other words, although the renewal applicant may only be responsible for a fraction of the total exposure (greater than 5%), the applicant (along with any other licensee undergoing renewal at the same time) will trigger the EA process, unless suitable corrective measures are taken to prevent non-compliance before an EA is necessary. In addition, in a renewal situation if a determination of non-compliance is made, other co-located transmitters contributing more than the 5% threshold level must share responsibility for compliance, regardless of whether they are categorically excluded from routine evaluation or submission of an EA.

66

**Table 1.** LIMITS FOR MAXIMUM PERMISSIBLE EXPOSURE (MPE)

## (A)  Limits for Occupational/Controlled Exposure

| Frequency Range (MHz) | Electric Field Strength (E) (V/m) | Magnetic Field Strength (H) (A/m) | Power Density (S) (mW/cm$^2$) | Averaging Time $|E|^2$, $|H|^2$ or S (minutes) |
|---|---|---|---|---|
| 0.3-3.0 | 614 | 1.63 | (100)* | 6 |
| 3.0-30 | 1842/f | 4.89/f | (900/f$^2$)* | 6 |
| 30-300 | 61.4 | 0.163 | 1.0 | 6 |
| 300-1500 | -- | -- | f/300 | 6 |
| 1500-100,000 | -- | -- | 5 | 6 |

## (B)  Limits for General Population/Uncontrolled Exposure

| Frequency Range (MHz) | Electric Field Strength (E) (V/m) | Magnetic Field Strength (H) (A/m) | Power Density (S) (mW/cm$^2$) | Averaging Time $|E|^2$, $|H|^2$ or S (minutes) |
|---|---|---|---|---|
| 0.3-1.34 | 614 | 1.63 | (100)* | 30 |
| 1.34-30 | 824/f | 2.19/f | (180/f$^2$)* | 30 |
| 30-300 | 27.5 | 0.073 | 0.2 | 30 |
| 300-1500 | -- | -- | f/1500 | 30 |
| 1500-100,000 | -- | -- | 1.0 | 30 |

f = frequency in MHz                    *Plane-wave equivalent power density

NOTE 1: *Occupational/controlled* limits apply in situations in which persons are exposed as a consequence of their employment provided those persons are fully aware of the potential for exposure and can exercise control over their exposure.  Limits for occupational/controlled exposure also apply in situations when an individual is transient through a location where occupational/controlled limits apply provided he or she is made aware of the potential for exposure.

NOTE 2: *General population/uncontrolled* exposures apply in situations in which the general public may be exposed, or in which persons that are exposed as a consequence of their employment may not be fully aware of the potential for exposure or can not exercise control over their exposure.

67



_Figure 1._  FCC Limits for Maximum Permissible Exposure (MPE)
Plane-wave Equivalent Power Density

**TABLE 2**: TRANSMITTERS, FACILITIES AND OPERATIONS SUBJECT TO ROUTINE ENVIRONMENTAL EVALUATION

| | |
|---|---|
| Experimental Radio Services (part 5) | power > 100 W ERP (164 W EIRP) |
| Multipoint Distribution Service (subpart K of part 21) | <u>non-building-mounted antennas</u>: height above ground level to lowest point of antenna < 10 m <u>and</u> power > 1640 W EIRP <br> <u>building-mounted antennas</u>: <br> power > 1640 W EIRP |
| Paging and Radiotelephone Service (subpart E of part 22) | <u>non-building-mounted antennas</u>: height above ground level to lowest point of antenna < 10 m <u>and</u> power > 1000 W ERP (1640 W EIRP) <br> <u>building-mounted antennas</u>: <br> power > 1000 W ERP (1640 W EIRP) |
| Cellular Radiotelephone Service (subpart H of part 22) | <u>non-building-mounted antennas</u>: height above ground level to lowest point of antenna < 10 m <u>and</u> total power of all channels > 1000 W ERP (1640 W EIRP) <br> <u>**building-mounted antennas**</u>: <br> **total power of all channels > 1000 W ERP (1640 W EIRP)** |

69

**TABLE 2 (cont.)**

| | |
|---|---|
| Personal Communications Services (part 24) | (1) Narrowband PCS (subpart D): <u>non-building-mounted antennas</u>:  height above ground level to lowest point of antenna < 10 m <u>and</u> total power of all channels > 1000 W ERP (1640 W EIRP) <u>building-mounted antennas</u>: total power of all channels > 1000 W ERP (1640 W EIRP)<br><br>(2) Broadband PCS (subpart E): <u>non-building-mounted antennas</u>:  height above ground level to lowest point of antenna < 10 m <u>and</u> total power of all channels > 2000 W ERP (3280 W EIRP) <u>building-mounted antennas</u>: total power of all channels > 2000 W ERP (3280 W EIRP) |
| Satellite Communications (part 25) | all included |
| General Wireless Communications Service (part 26) | total power of all channels > 1640 W EIRP |
| Wireless Communications Service (part 27) | total power of all channels > 1640 W EIRP |
| Radio Broadcast Services (part 73) | all included |

**TABLE 2 (cont.)**

| | |
|---|---|
| Experimental, auxiliary, and special broadcast and other program distributional services (part 74) | subparts A, G, L: power > 100 W ERP<br><br>subpart I:<br>non-building-mounted antennas: height above ground level to lowest point of antenna < 10 m and power > 1640 W EIRP<br>building-mounted antennas:<br>power > 1640 W EIRP |
| Stations in the Maritime Services (part 80) | ship earth stations only |
| Private Land Mobile Radio Services Paging Operations (part 90) | non-building-mounted antennas: height above ground level to lowest point of antenna < 10 m and power > 1000 W ERP (1640 W EIRP)<br>building-mounted antennas: power > 1000 W ERP (1640 W EIRP) |
| Private Land Mobile Radio Services Specialized Mobile Radio (part 90) | non-building-mounted antennas: height above ground level to lowest point of antenna < 10 m and total power of all channels > 1000 W ERP (1640 W EIRP)<br>building-mounted antennas:<br>total power of all channels > 1000 W ERP (1640 W EIRP) |

71

**TABLE 2 (cont.)**

| | |
|---|---|
| Amateur Radio Service (part 97) | transmitter output power > levels specified in § 97.13(c)(1) of this chapter (see Table 1 in text) |
| Local Multipoint Distribution Service (subpart L of part 101) | <u>non-building-mounted antennas</u>: height above ground level to lowest point of antenna < 10 m <u>and</u> power > 1640 W EIRP <u>building-mounted antennas</u>:  power > 1640 W EIRP<br><br>LMDS licensees are required to attach a label to subscriber transceiver antennas that: (1) provides adequate notice regarding potential radiofrequency safety hazards, *e.g.,* information regarding the safe minimum separation distance required between users and transceiver antennas; and (2) references the applicable FCC-adopted limits for radiofrequency exposure specified in § 1.1310 of this chapter. |

## Mobile and Portable Devices

Mobile and portable transmitting devices that operate in the Cellular Radiotelephone Service, the Personal Communications Services (PCS), the Satellite Communications Services, the Maritime Services (ship earth stations only) and the Specialized Mobile Radio (SMR) Service are subject to routine environmental evaluation for RF exposure prior to equipment authorization or use, as specified in 47 CFR § 2.1091 and § 2.1093. Unlicensed PCS and millimeter wave devices are also subject to routine environmental evaluation for RF exposure prior to equipment authorization or use, as specified in 47 C.F.R. § 15.253(f), § 15.255(g), and § 15.319(i). All other mobile, portable, and unlicensed transmitting devices are categorically excluded from routine environmental evaluation for RF exposure under 47 CFR § 2.1091 and § 2.1093, except (as described previously) as specified in 47 CFR § 1.1307(c) and (d) .

### (a) Mobile Devices

This section describes the requirements of Section 2.1091 of the FCC's Rules (47 CFR § 2.1091) that apply to "mobile" devices. For purposes of these requirements mobile devices are defined as transmitters designed to be used in other than fixed locations and to generally be used in such a way that a separation distance of at least 20 centimeters is normally maintained between the transmitter's radiating structure(s) and the body of the user or nearby persons. In this context, the term "fixed location" means that the device is physically secured at one location and is not able to be easily moved to another location. Transmitting devices designed to be used by consumers or workers that can be easily re-located, such as wireless devices associated with a personal computer, are considered to be mobile devices if they meet the 20 centimeter separation requirement.

Mobile devices that operate in the Cellular Radiotelephone Service, the Personal Communications Services, the Satellite Communications Services, the General Wireless Communications Service, the Wireless Communications Service, the Maritime Services and the Specialized Mobile Radio Service authorized under the following parts and subparts of the FCC's Rules: subpart H of part 22, part 24, part 25, part 26, part 27, part 80 (ship earth station devices only) and part 90 (SMR devices only), are subject to routine environmental evaluation for RF exposure prior to equipment authorization or use if they operate at frequencies of 1.5 GHz or below and their effective radiated power (ERP) is 1.5 watts or more, or if they operate at frequencies above 1.5 GHz and their ERP is 3 watts or more. Unlicensed personal communications service devices, unlicensed millimeter wave devices and unlicensed NII devices authorized under FCC Rule parts 15.253, 15.255 and subparts D and E of part 15 are also subject to routine environmental evaluation for RF exposure prior to equipment authorization or use if their ERP is 3 watts or more or if they meet the definition of a portable device as specified below, requiring evaluation under the provisions of 47 CFR §2.1093. All other mobile and unlicensed transmitting devices are categorically excluded from routine environmental evaluation for RF exposure prior to equipment authorization or use, except as specified in 47 CFR §§ 1.1307(c) and 1.1307(d), as discussed previously.

The limits to be used for evaluation of mobile and unlicensed devices (except portable unlicensed devices) are the MPE field strength and power density limits specified in Table 1 above (and in 47 CFR §1.1310). Applications for equipment authorization must contain a statement confirming compliance with these exposure limits as part of their application. Technical information showing the basis for this statement must be submitted to the Commission upon request.

All unlicensed personal communications service (PCS) devices shall be subject to the limits for general population/uncontrolled exposure. For purposes of analyzing mobile transmitting devices under the occupational/controlled criteria specified in Table 1, time-averaging provisions of the guidelines may be used in conjunction with typical maximum duty factors to determine maximum likely exposure levels. Time-averaging provisions may not be used in determining typical exposure levels for devices intended for use by consumers in general population/uncontrolled environments. However, "source-based" time-averaging based on an inherent property or duty-cycle of a device is allowed. An example of this is the determination of exposure from a device that uses digital technology such as a time-division multiple-access (TDMA) scheme for transmission of a signal. In general, maximum average rms power levels should be used to determine compliance.

If appropriate, compliance with exposure guidelines for mobile and unlicensed devices can be accomplished by the use of warning labels and by providing users with information concerning minimum separation distances from transmitting structures and proper installation of antennas.

In some cases, for example, modular or desktop transmitters, the potential conditions of use of a device may not allow easy classification of that device as either mobile or portable. In such cases, applicants are responsible for determining minimum distances for compliance for the intended use and installation of the device based on evaluation of either specific absorption rate (SAR), field strength or power density, whichever is most appropriate.

## (b) Portable Devices

This section describes the requirements of Section 2.1093 of the FCC's Rules (47 CFR §2.1093) that apply to "portable" devices. For purposes of these requirements a portable device is defined as a transmitting device designed to be used so that the radiating structure(s) of the device is/are within 20 centimeters of the body of the user.

Portable devices that operate in the Cellular Radiotelephone Service, the Personal Communications Services, the Satellite Communications Services, the General Wireless Communications Service, the Wireless Communications Service, the Maritime Services and the Specialized Mobile Radio Service, and authorized under the following sections of the FCC's rules: subpart H of part 22, part 24, part 25, part 26, part 27, part 80 (ship earth

station devices only), part 90 (SMR devices only), and portable unlicensed personal communication service, unlicensed NII devices and millimeter wave devices authorized under rule parts 47 CFR §§15.253, 15.255 or subparts D and E of part 15, are subject to routine environmental evaluation for RF exposure prior to equipment authorization or use. All other portable transmitting devices are categorically excluded from routine environmental evaluation for RF exposure prior to equipment authorization or use, except as specified in 47 CFR §§ 1.1307(c) and (d), as discussed previously. Applications for equipment authorization of portable transmitting devices subject to routine environmental evaluation must contain a statement or certification confirming compliance with the limits specified below as part of their application. Technical information showing the basis for this statement must be submitted to the Commission upon request.

The limits to be used for evaluation are based generally on criteria published by the Institute of Electrical and Electronics Engineers, Inc., (IEEE) for localized specific absorption rate ("SAR") in Section 4.2 of "IEEE Standard for Safety Levels with Respect to Human Exposure to Radio Frequency Electromagnetic Fields, 3 kHz to 300 GHz," ANSI/IEEE C95.1-1992, Copyright 1992 by the Institute of Electrical and Electronics Engineers, Inc., New York, New York 10017. These criteria for SAR evaluation are similar to those recommended by the National Council on Radiation Protection and Measurements (NCRP) in "Biological Effects and Exposure Criteria for Radiofrequency Electromagnetic Fields," NCRP Report No. 86, Section 17.4.5. Copyright NCRP, 1986, Bethesda, Maryland 20814. SAR is a measure of the rate of energy absorption per unit mass due to exposure to an RF transmitting source. SAR values have been related to threshold levels for potentially adverse biological effects. The criteria to be used are specified below and shall apply for portable devices transmitting in the frequency range from 100 kHz to 6 GHz. Portable devices, as defined above, that transmit at frequencies above 6 GHz are to be evaluated in terms of the MPE limits specified in Table 1 above (and in 47 CFR §1.1310). Measurements and calculations to demonstrate compliance with MPE field strength or power density limits for devices operating above 6 GHz should be made at a minimum distance of 5 cm from the radiating source.

(1) **Limits for Occupational/Controlled exposure:** 0.4 W/kg as averaged over the whole-body and spatial peak SAR not exceeding 8 W/kg as averaged over any 1 gram of tissue (defined as a tissue volume in the shape of a cube). Exceptions are the hands, wrists, feet and ankles where the spatial peak SAR shall not exceed 20 W/kg, as averaged over any 10 grams of tissue (defined as a tissue volume in the shape of a cube). Occupational/Controlled limits apply when persons are exposed as a consequence of their employment provided these persons are fully aware of and exercise control over their exposure. Awareness of exposure can be accomplished by use of warning labels or by specific training or education through appropriate means, such as an RF safety program in a work environment.

(2) **Limits for General Population/Uncontrolled exposure:** 0.08 W/kg as averaged over the whole-body and spatial peak SAR not exceeding 1.6 W/kg as averaged over any 1 gram of tissue (defined as a tissue volume in the shape of a cube). Exceptions are the hands, wrists, feet and ankles where the spatial peak SAR shall not exceed 4 W/kg, as averaged over

any 10 grams of tissue (defined as a tissue volume in the shape of a cube). General Population/Uncontrolled limits apply when the general public may be exposed, or when persons that are exposed as a consequence of their employment may not be fully aware of the potential for exposure or do not exercise control over their exposure. Warning labels placed on consumer devices such as cellular telephones will not be sufficient reason to allow these devices to be evaluated subject to limits for occupational/controlled exposure.

Compliance with SAR limits can be demonstrated by laboratory measurement techniques or by computational modeling, as appropriate. Methodologies and references for SAR evaluation are described in technical publications including "IEEE Recommended Practice for the Measurement of Potentially Hazardous Electromagnetic Fields – RF and Microwave," IEEE C95.3-1991, and further guidance on measurement and computational protocols is being developed by the IEEE and others (see text of this bulletin for further discussion).

For purposes of analyzing a portable transmitting device under the occupational/controlled criteria only, the time-averaging provisions of the MPE guidelines identified in Table 1 above can be used in conjunction with typical maximum duty factors to determine maximum likely exposure levels. However, assurance must be given that use of the device will be limited to occupational or controlled situations, as defined previously.

Time-averaging provisions of the MPE guidelines identified in Table 1 may not be used in determining typical exposure levels for portable devices intended for use by consumers, such as hand-held cellular telephones, that are considered to operate in general population/uncontrolled environments as defined above. However, "source-based" time-averaging based on an inherent property or duty-cycle of a device is allowed. An example of this would be the determination of exposure from a device that uses digital technology such as a time-division multiple-access (TDMA) scheme for transmission of a signal. In general, maximum average rms power levels should be used to determine compliance.



# United States of America
## Federal Communications Commission

# RADIO STATION AUTHORIZATION

### Commercial Mobile Radio Services

### Personal Communications Service - Broadband

OMNIPOINT BOSTON D LICENSE, LLC
3 BETHESDA METRO CENTER
SUITE 400
BETHESDA, MD 20814

| | |
|---|---|
| Call Sign: | KNLF954 |
| Market: | B051 |
| | BOSTON, MA |
| Channel Block: | D |
| File Number: | 50117-CW-AL-98 |

The licensee hereof is authorized, for the period indicated, to construct and operate radio transmitting facilities in accordance with the terms and conditions hereinafter described. This authorization is subject to the provisions of the Communications Act of 1934, as amended, subsequent Acts of Congress, international treaties and agreements to which the United States is a signatory, and all pertinent rules and regulations of the Federal Communications Commission, contained in the Title 47 of the U.S. Code of Federal Regulations.

| | |
|---|---|
| Initial Grant Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | June 27, 1997 |
| Five Year Build Out Date . . . . . . . . . . . . . . . . . . | June 27, 2002 |
| Expiration Date . . . . . . . . . . . . . . . . . . . . . . . . . . . | June 27, 2007 |

## CONDITIONS :

Pursuant to Section 309(h) of the Communications Act of 1934, as amended, (47 U.S.C. § 309(h)), this license is subject to the following conditions: This license does not vest in the licensee any right to operate a station nor any right in the use of frequencies beyond the term thereof nor in any other manner than authorized herein. Neither this license nor the right granted thereunder shall be assigned or otherwise transferred in violation of the Communications Act of 1934, as amended (47 U.S.C. § 151, et seq.). This license is subject in terms to the right of use or control conferred by Section 706 of the Communications Act of 1934, as amended (47 U.S.C. § 606).

Conditions continued on Page 2.

## WAIVERS :

No waivers associated with this authorization.

Issue Date:  January 22, 1998
FCC Form 463a

## CONDITIONS:

This authorization is subject to the condition that, in the event that systems using the same frequencies as granted herein are authorized in an adjacent foreign territory (Canada/United States), future coordination of any base station transmitters within 72 km (45 miles) of the United States/Canada border shall be required to eliminate any harmful interference to operations in the adjacent foreign territory and to ensure continuance of equal access to the frequencies by both countries.

This authorization is subject to the condition that the remaining balance of the winning bid amount will be paid in accordance with Part 1 of the Commission's rules, 47 C.F.R. Part 1.



# United States of America
## Federal Communications Commission

# RADIO STATION AUTHORIZATION

## Commercial Mobile Radio Services
## Personal Communications Service - Broadband

Omnipoint Boston Area DE License, Inc.
3 Bethesda Metro Center
Suite 400
Bethesda, MD 20814

Call Sign: KNLH310
Market: B051
BOSTON, MA
Channel Block: E
Filing Number: 01519-CW-L-9

The licensee hereof is authorized, for the period indicated, to construct and operate radio transmitting facilities in accordance with the terms and conditions hereinafter described. This authorization is subject to the provisions of the Communications Act of 1934, as amended, subsequent Acts of Congress, international treaties and agreements to which the United States is a signatory, and all pertinent rules and regulations of the Federal Communications Commission, contained in the Title 47 of the U.S. Code of Federal Regulations.

Initial Grant Date . . . . . . . . . . . . . . . . . June 27, 1997

Five Year Build Out Date . . . . . . . . . . . . . . June 27, 2002

Expiration Date  . . . . . . . . . . . . . . . . . . July 27, 2007

## CONDITIONS:

Pursuant to Section 309(h) of the Communications Act of 1934, as amended, (47 U.S.C. 309(h)), this license is subject to the following conditions: This license does not vest in the licensee any right to operate a station nor any right in the use of frequencies beyond the term thereof nor in any other manner than authorized herein. Neither this license nor the right granted thereunder shall be assigned or otherwise transferred in violation of the Communications Act of 1934, as amended (47 U.S.C. 151, et seq.). This license is subject in terms to the right of use or control conferred by Section 706 of the Communications Act of 1934, as amended (47 U.S.C. 606).

(Conditions continued on Page 2)

## WAIVERS:

No waivers associated with this authorization.

FCC Form 463B
April 1997

TOTAL P.03

*(handwritten)* Brookline Basile Team 1

# VikingGlobal

*Technology, Innovation & Integration*

July 20, 2002

**VoiceStream Wireless**
Site Number- B0-380-03
Site Address- 183-189 Grove Street
                Brookline, MA
Site Type-  RT/FP

## NEPA CHECKLIST

|  | Yes | No | N/A |
|---|---|---|---|
| • Is the proposed facility located in an officially designated wilderness area. | ☐ | ☐ | ☒ |
| • Is the proposed facility located in an officially designated wildlife preserve. | ☐ | ☐ | ☒ |
| • Will the proposed facility likely affect threatened or endangered species or critical habitats. | ☐ | ☐ | ☒ |
| • Will the proposed facility likely jeopardize the continued existence of any proposed endangered or threatened species. | ☐ | ☐ | ☒ |
| • Will the proposed facility likely result in the destruction or adverse modification of proposed critical habitats ( as determined by the Endangered Species Act of 1973). | ☐ | ☐ | ☒ |
| • Will the facility affect districts, sites, buildings, structures or objects, significant in American History, architecture, archaeology, engineering or culture, that are listed (or eligible for listing) in the National Register of Historic Places. | ☐ | ☒ | ☐ |
| • Will the facility affect Indian religious site(s). | ☐ | ☐ | ☒ |
| • Is the facility located in a flood plain. | ☐ | ☐ | ☒ |
| • Will the construction of the proposed facility involve significant change in surface features (e.g. wetland fill, deforestation or water diversion). | ☐ | ☐ | ☒ |
| • Is the proposed facility located in a residential neighborhood and is required to be equipped with high intensity white lights ( as defined by local zoning laws). | ☐ | ☐ | ☒ |

VikingGlobal Corporation has completed this checklist in general accordance with the National Environmental Policy Act. This information is presented for the exclusive use of VoiceStream Wireless.

*(signature)*

Chantelle Szecsey
Environmental Compliance Director

**Attachments**

# VikinGlobal

*Technology, Innovation & Integration*

July 3, 2002

**RECEIVED**

JUL 0 5 2002

MASS. ..... COMM

Ms. Brona Simon
Massachusetts Historical Commission
220 Morrissey Boulevard
Boston, MA  02125

RE:   Section 106 Determination
      Proposed Telecommunication Facility
      VoiceStream Site Number B0-380-02 3
      183-189 Grove Street
      Brookline, MA

Dear Ms. Simon:

In accordance with FCC regulations in 47 CFR 1.1307(a)(4), VikinGlobal requests that the MHC make a Section 106 determination for the proposed wireless telecommunication facility at the above-referenced location.

Enclosed for your review is a site information sheet, topo map and preliminary design drawings. Should you have any questions or comments concerning our request, please contact me at 401/241-0109 or 664 Pasley Avenue Atlanta, GA 30316.   Please reference VoiceStream site number B0-380-02 in your correspondence.

Very truly yours,

VikinGlobal Corporation

Chantelle Szecsey
Environmental Compliance Director

Enclosures

After review of MHC files and the materials
you submitted, it has been determined that
this project is unlikely to affect significant
historic or archaeological resources.

*Stacey Wrkstein*    7/16/02
Stacey Wrkstein        Date
Preservation Planner
Massachusetts Historical Commission
*xc: Brookline Hist. Comm.*



SITE

Copyright (C) 1997, Maptech, Inc.



Copyright (C) 1997, Maptech, Inc.



RECEIVED
TOWN OF BROOKLINE
TOWN CLERK

2005 MAR -3 P 7 50

**TOWN OF BROOKLINE**
**BOARD OF APPEALS**
**CONSOLIDATED APPEALS # 40002 AND 40003**

**DECISION UPON APPLICATIONS FOR SPECIAL PERMITS**
**BY T-MOBILE AND VERIZON WIRELESS TO INSTALL**
**WIRELESS TELECOMMUNICATIONS ANTENNAS AND**
**ASSOCIATED EQUIPMENT ON THE PROPERTY KNOWN AND**
**NUMBERED AS 183 GROVE STREET, BROOKLINE, MASSACHUSETTS**

The Petitioners, T-Mobile and Verizon Wireless, filed applications, numbered 40002 and 40003, to install wireless communications antennas and associated equipment on the property generally known as the Shops at Putterham, also known and numbered as 183-189 Grove Street and 1004-1022 West Roxbury Parkway, in Brookline, Massachusetts (the Property), owned by Robert W. Basile, Trustee (the Owner). The two applications were consolidated for hearing and decision purposes, by agreement of the parties, at the suggestion of this Board. The first Hearing was held on August 12, 2004, and substantial evidence and testimony was received but the Hearing process was not completed. Notice for the August 12, 2004 Hearing was published on July 22, 2004 and July 29, 2004, in the Brookline TAB, copies of said notice are attached hereto in Exhibit A and made a part of this Decision. Notice of the Hearing was mailed to the Owner, the Applicants and their attorneys, to the owners of properties deemed by the Board to be affected as their names appear on the then most recent local real estate tax list, to the Planning Board and to all others entitled, by law, to such notice. After several postponements, additional notice for the December 9, 2004, consolidated Hearing was published on November 25, 2004 and December 2, 2004, in the Brookline TAB, copies of said notice are attached hereto in Exhibit B and made a part of this Decision. Notice

1

of the Hearing was mailed to the Owner, the Applicants and their attorneys, to the owners of properties deemed by the Board to be affected as their names appear on the then most recent local real estate tax list, to the Planning Board and to all others entitled, by law, to such notice.

At the time and place specified in the notice, a Public Hearing was convened on December 9, 2004. Present at the hearing were Diane R. Gordon, Chair, and Board Members Bailey S. Silbert and Enid Starr, the three members who participated in the earlier Hearing on August 12, 2004.

## A.    BACKGROUND

Ricardo M. Sousa, Esquire of Prince, Lobel, Glovsky & Tye, LLP appeared on behalf of T-Mobile. John M. Moran, President of Alpine Advisory Services, appeared on behalf of Verizon Wireless. Attorney Sousa and Mr. Moran made presentations for the Applicants.  Anna Adkins, RF Engineer, testified for the Applicants.

At the hearing, Polly Selkoe, Chief Planner, distributed a memorandum from the Planning Board dated July 22, 2004.  The memorandum was accepted by the Board.

Both Applicants are personal wireless service providers and are licensed by the Federal Communications Commission to provide cellular telephone services to a geographic area that includes the Town of Brookline.  Cellular telephones work by transmitting a low power signal between a mobile telephone and a wireless telecommunications facility, or "cell site."  A cell site consists of antennae, in these Applications contained in a large monopole. As a caller moves out of the coverage range of one cell, the signal is "handed off" from the cell site in one cell to the cell site of an

adjacent cell. For there to be continuous service, it is critical that the facilities within each

cell be located in accordance with radio frequency ("RF") principles, taking into account

overall network design. RF design must accommodate such features as the height of the

proposed antenna, topographical concerns, the geographic distance and direction of the

proposed facility to other facilities in the network, and customer demands for service.

There is currently a "coverage gap" in certain areas in Brookline, including South

Brookline and Chestnut Hill.  The existence of a coverage gap means that there is

currently not enough signal strength to allow customers reliably to initiate or hold calls

when located within or traveling through these areas.  Using the RF principles described

above, the Applicants' engineers determined that a facility located within South

Brookline would remedy some portion of the coverage gap. Testimony from residents

and others familiar with the topographical concerns, the geographic distances and

location of the proposed facilities established that the existing gaps in substantial sections

of South Brookline would not be remedied by the Applicants' proposed facilities.

Throughout the hearing process, a number of abutters to the proposed site and

other residents expressed opposition to the construction of the facility on the Property and

their concerns about the visibility of the monopoles, the attendant noise of the generator

and the flags themselves and their impact upon the contiguous residential neighborhoods.

Additionally, 300 residents submitted petitions expressing opposition to and citing the

negative visual and noise impact that the monopoles would have upon their

neighborhoods and nearby Town property.

Opposition to the Applications and the issuance of Special Permits is best

summarized by the testimony of a neighbor, Alisa Jonas. During her testimony she stated

that:

[t]he reasons for my opposition to the Putterham proposal are the following: First, the location of the towers, whether [or not] Putterham is inadequate from a technical coverage perspective. Rather than being on the top of the hill, it's on the bottom of the hill. Thus, as confirmed to us by cell company representatives, those streets on the other side of that hill, for example, Walnut, Walnut Hill, Beverly, Rangeley, Wolcott will not get the coverage, since the hill will block the signals. An elevated location from which signals will not be blocked from traveling thus would be far superior.

Second, even for those residents not blocked from coverage only those with Verizon and T-Mobile will benefit from improved reception, which leads to the third reason, the public safety aspect. The police and fire departments use Nextel for cell coverage, so the towers ... will do nothing to improve that communication.

And the lack of coverage for both residents with cell phones from other cell companies, and for residents on the other side of Walnut Hill further makes this proposal an inadequate option for the purposes of improving public safety.

Fourth, the Town's By-Laws for wireless communications states that a monopole tower is not permitted in a residential district. In this case we have the unusual situation where one building is zoned commercial, but all the land surrounding the building is residential. Thus for all intent and purposes, [these] monopole[s], while located on a building on commercial land, will essentially be in a residential district.

Further, the purpose section of the bylaws state [that] the towers are prohibited where they may be incompatible with existing residential uses. To allow the placement of two monopoles on the one commercial building surrounded by a residential district thwarts the intent and purposes of the bylaws to prevent such monopoles to be imposed directly on residences.

With South Street homes facing directly onto the building, they will bear the immediate brunt of this application ... . And what the neighbors will have to deal with, quite aside from potential health considerations, if there are any, is the generator noise from the Verizon monopole, as well as the view of lighted towers through the night, which is completely inappropriate for a residential neighborhood.

Further, the visual aesthetic of having two tall poles on top of the building, that is only one floor tall is an out-of-scale and unattractive image.

4

The Verizon representative mentioned the monopole on the Fleet Bank, and I know there were some people in town who said, well, there's monopoles on the Fleet Bank ... why can't we have something like that at Putterham Circle.

I think that my nine-year-old daughter and two friends spoke eloquently to that point. We drove past the bank. I asked them what they thought of the monopole. They told me that they thought it looked okay. Then I asked [what] they would think of two such monopoles on Putterham Shops, and they immediately said, Oh, that would look ridiculous. The building is much too small.

Sometimes it takes the clearheadedness of youth to see so easily what is appropriate and what is not. And, in fact, Verizon representatives told us the ones at the Putterham Shops are even more massive than the one at the Fleet Bank.

There also appears to be a technical aspect of this proposal that is prohibited by the bylaws. As I understand Section 2I, I think in the bylaws, the towers must be set back 60 feet from all boundaries of the site. It appears that at least one of the monopoles that's located on the cupola does not have the adequate setback. It appears to be at least conservatively nine feet short, which is inadequate technically and from a safety perspective.

Finally, the bylaws require that an explanation must be submitted to explain the process used in selecting the site and other alternatives explored. The South Brookline Neighborhood Association Board of Directors asked the cell companies [the Applicants] why they did not [consider sites on] Town land ... [that are] potentially better [for the] siting of cell towers ... [than the Property]. They told us that they believed [that] the Town is not interested; that the idea of cell towers on Town land had been [rejected] by Town Meeting years before. And that since that time, the Town had not issued an RFP.

The times for cell phones have changed radically ... and the Town is actively pursuing an optimum location on Town land to be presented for a vote at the spring Town Meeting.

The bylaws state repeatedly that a monopole can only be approved if no other alternative is possible. When this proposal was initiated by the cell companies, they were not aware of these alternatives currently being considered.

For those reasons, I ask you not to approve this proposal when hopefully a better one will be presented to Town Meeting in the spring.

There were ten residents representing local neighborhood groups, and many individual residents who spoke in opposition to the proposals. One resident, a tenant of the Owner, spoke in favor of the Applications.

## B.    FINDINGS OF FACT

RECEIVED
TOWN OF BROOKLINE
TOWN CLERK

2005 MAR -3 P 3 58

1.    T-Mobile and Verizon are licensed personal wireless providers;

2.    There is currently a "coverage gap" in South Brookline;

3.    The Property is located in South Brookline;

4.    The Applicants allege the proposed "cell site" will eliminate the "coverage gap" for this system;

5.    The proposed two monopoles to be installed on top of the existing one story building on the Property will not, because of their location at the bottom of the hill, provide service to that section of South Brookline on the reverse side or other side of that hill;

6.    The proposed two monopoles will affect the "coverage gap" for only those two providers and will not eliminate all of the "coverage gaps" for the Applicants;

7.    The size and location of the two monopoles will have more than a "minimum visual impact" upon both the small, confined business area known as the Shops at Putterham and the large surrounding residential neighborhoods. They rise over 52 feet above the ground and 40 feet above the roof of one building. Their diameter is 18 inches (much larger than a flag pole) and will be illuminated throughout the night;

8.    There are several feasible alternative sites, on Town owned property, that have not been investigated by the Applicants;

9.    The Applicants' representations that the Town is not interested in making Town land available as "cell sites" is contrary to the records of the Town;

10.    By unanimous vote of a November 16, 2004, Brookline Town Meeting, under Article 11 in the Warrant for that meeting, a copy of which is attached as Exhibit C, together with the official record for that Article, which the Board includes as Judicial Notice, the Town notes that it has, in the past, dealt constructively with cellular providers in the siting of antennas and will, in the future, commencing with a Moderator's Committee, find a timely solution to both the "coverage" and public safety services needed in South Brookline, including the use of Town property;

11.    The proposed monopoles cannot be screened and will have a profound impact upon the contiguous low-density residential districts;

12.    The Applicants did not investigate several feasible alternatives on Town property. A map that shows the large amount of Town owned land in South Brookline is

attached as <u>Exhibit D</u>. The Applicants did not contact the Moderator's Committee, appointed under the unanimous vote adopted at the November 16, 2004 Town Meeting, that is working to provide a timely solution to improving wireless communication services in South Brookline;

13.    The Property is not an appropriate location for the proposed monopoles;

14.    The monopoles, as proposed, would adversely affect the neighborhood; and

15.    The Applicants' proposals do not solve, for their respective systems, for other "cell systems" or for the Town's public safety system, the coverage gap in South Brookline.

## C.    CONCLUSIONS

The location of the proposed monopoles, at the bottom of a hill, that blocks coverage on the other side of the hill; the lack of provisions for other wireless service providers; the lack of coverage for Brookline Public Safety Departments (using another wireless service provider); the lack of coverage for residents using other wireless service providers; the violation of monopole setback and screening requirements in the Brookline Zoning By-Law; and the unattractive image of two tall, large (in diameter) monopoles on the top of a one floor building in a small business district; and the Applicants' failure to investigate several feasible alternatives provide a reasonable basis to deny the Applications.

## DECISION

Based upon the foregoing, it is unanimously voted to DENY the Applicants'

Applications for Special Permits.

RECEIVED
TOWN OF BROOKLINE
TOWN CLERK

2005 MAR -3 P 3:59

Unanimous Decision of
the Board of Appeals of the
Town of Brookline

_Diane R. Gordon, Chair_

_Bailey S. Silbert_

_Enid Starr_

A True Copy,
ATTEST:

Town Clerk

Dated: March 3, 2005

8



**TOWN OF BROOKLINE
MASSACHUSETTS
BOARD OF APPEALS**

# NOTICE OF HEARING

Pursuant to M.G.L., C. 39, sections 23A & 23B, the Board of Appeals will conduct a public hearing to discuss the following case:

Petitioner:  BASILE ROBERT W TR. / Verizon
Location of Premises:  183 GROVE ST BRKL
Date of Hearing: 08/12/2004
Time of Hearing: 07:00p.m.
Place of Hearing: Selectmen's Hearing Room

A public hearing will be held for a variance and/or a special permit from

1)        4.09; Wireless Telecommunications Services;
  4.09.6.c; Special Permit Required.
2)        5.09.2.h; Design Review; Special Permit Required.

Of the Zoning By-Law to
install Wireless Telecommunications
Antennas; an Associated Equipmanet
Room; Temporary Portable Emergency
Generator as necessary and other related accessory structures for "Verizon Wireless"

at   183 GROVE ST BRKL

Said Premise located in a
L-0.5                                              district.

*The Town of Brookline does not discriminate on the basis of disability in admission to, access to, or operations of its programs, services or activities.  Individuals who need auxiliary aids for effective communication in programs and services of the Town of Brookline are invited to make their needs known to the ADA Coordinator, Stephen Bressler, Town of Brookline, 11 Pierce Stret, Brookline, MA 02445. Telephone: (617) 730-2330; TDD (617)-730-2327.*

Diane R. Gordon
Harry Miller
Bailey Silbert

Publish: 07/22/2004, and 07/29/2004

RECEIVED
TOWN OF BROOKLINE
TOWN CLERK
2004 JUL 19 P 3: 15



**TOWN OF BROOKLINE**
**MASSACHUSETTS**
**BOARD OF APPEALS**

# NOTICE OF HEARING

Pursuant to M.G.L., C. 39, sections 23A & 23B, the Board of Appeals will conduct a public hearing to discuss the following case:

Petitioner: BASILE ROBERT W TR
Location of Premises: 183 GROVE ST BRKL
Date of Hearing: 08/12/2004
Time of Hearing: 07:00p.m.
Place of Hearing: Selectmen's Hearing Room, 6th. Floor

A public hearing will be held for a variance and/or a special permit from

4.09; Wireless Telecommunications Services;
  4.09.6.c; Special Permit Required.
2)        5.09.2.h; Design Review; Special Permit Required.

Of the Zoning By-Law to
installWireless Telecommunications
Antennas; an Associated Equipment
Room; and Emergency Generator and
other related accessory structures for

at   183 GROVE ST BRKL

Said Premise located in a
L-0.5                                                    district.

*The Town of Brookline does not discriminate on the basis of disability in admission to, access to, or operations of its programs, services or activities. Individuals who need auxiliary aids for effective communication in programs and services of the Town of Brookline are invited to make their needs known to the ADA Coordinator, Stephen Bressler, Town of Brookline, 11 Pierce Stret, Brookline, MA 02445. Telephone: (617) 730-2330; TDD (617)-730-2327.*

Diane R. Gordon
Harry Miller
Bailey Silbert

Publish:  07/22/2004, and 07/29/2004



# TOWN OF BROOKLINE
# MASSACHUSETTS
# BOARD OF APPEALS

# NOTICE OF HEARING

Pursuant to M.G.L., C. 39, sections 23A & 23B, the Board of Appeals will conduct a public hearing to discuss the following case:

Petitioner:  BASILE ROBERT W TR / Verizon
Location of Premises: **183 GROVE ST BRKL**
Date of Hearing:  12/9/2004
Time of Hearing: **07:15 p.m.**
Place of Hearing: **Selectmen's Hearing Room**

A public hearing will be held for a variance and/or a special permit from

1)       **4.09; Wireless Telecommunications Services;**
    **4.09.6.c; Special Permit Required.**
2)       **5.09.2.h; Design Review; Special Permit Required.**

Of the Zoning By-Law to
install Wireless Telecommunications
Antennas; an Associated Equipmanet
Room; Temporary Portable Emergency
Generator as necessary and other related accessory structures for "Verizon Wireless"

at   **183 GROVE ST BRKL**

Said Premise located in a
**L-0.5**                                                    district.

*The Town of Brookline does not discriminate on the basis of disability in admission to, access to, or operations of its programs, services or activities. Individuals who need auxiliary aids for effective communication in programs and services of the Town of Brookline are invited to make their needs known to the ADA Coordinator, Stephen Bressler, Town of Brookline, 11 Pierce Stret, Brookline, MA 02445. Telephone: (617) 730-2330; TDD (617)-730-2327.*

**Diane R. Gordon**
**Harry Miller**
**Bailey Silbert**

**Publish:**    11/25/2004 and 12/02/2004



**TOWN OF BROOKLINE**
**MASSACHUSETTS**
**BOARD OF APPEALS**

# NOTICE OF HEARING

Pursuant to M.G.L., C. 39, sections 23A & 23B, the Board of Appeals will conduct a public hearing to discuss the following case:

Petitioner:  BASILE ROBERT W TR / T Mobile
Location of Premises:  183 GROVE ST BRKL
Date of Hearing: 12/9/2004
Time of Hearing: 7:15 p.m.
Place of Hearing: Selectmen's Hearing Room

A public hearing will be held for a variance and/or a special permit from

1)      4.09; Wireless Telecommunications Services;
   4.09.6.c; Special Permit Required.
2)      5.09.2.h; Design Review; Special Permit Required.

Of the Zoning By-Law to
install Wireless Telecommunications
Antennas; an Associated Equipmanet
Room; Temporary Portable Emergency
Generator as necessary and other related
accessory structures for "T Mobile"
at   183 GROVE ST BRKL

Said Premise located in a
L-0.5
                                          district.

*The Town of Brookline does not discriminate on the basis of disability in admission to, access to, or operations of its programs, services or activities. Individuals who need auxiliary aids for effective communication in programs and services of the Town of Brookline are invited to make their needs known to the ADA Coordinator, Stephen Bressler, Town of Brookline, 11 Pierce Stret, Brookline, MA 02445. Telephone: (617) 730-2330; TDD (617)-730-2327.*

                         Diane R. Gordon
                          Harry Miller
                          Bailey Silbert

Publish:   11/25/2004 and 12/02/2004

November 16, 2004
Special Town Meeting
Article 11 – Supplement No. 1

---
## ARTICLE 11
---

---
## SELECTMEN'S RECOMMENDATION ON ARTICLE 11
---

While both the Selectmen and the Advisory Committee recommend that a Moderator's Committee should be established to deal with the issue of locating cell towers, different language was voted. Therefore, at its November 2 meeting, the Board of Selectmen reconsidered its vote under Article 11. The Board agrees that the Advisory Committee's recommended language provides the Moderator's Committee with more clear direction, so they recommend FAVORABLE ACTION by a vote of 5-0 on the Advisory Committee's vote, which is reprinted below.

VOTED:        Town Meeting, recognizing the need for a timely solution to improving wireless communication services in South Brookline, refers the issues of siting telecommunication facilities in the town to a Moderator's committee for study with a report of immediately actionable recommendations of distinct and technically feasible options for the siting of equipment for such purposes to be included in one or more warrant articles presented at the 2005 Annual Town Meeting.

## ARTICLE 11

### ELEVENTH ARTICLE

To see if the town will authorize the Board of Selectmen to lease, for not more than ten years, upon such terms and conditions as the Board of Selectmen determines to be in the best interest of the town, a portion of the town-owned land known as the Walnut Hills Cemetery, to a company that will install and be responsible for the operation of a wireless telecommunications facility and related equipment to be used for wireless telecommunications, for an annual payment to the Town of not less than $50,000, or act on anything relative thereto.

### PLANNING BOARD REPORT AND RECOMMENDATION

The Planning Board (two to one) voted to recommend that if sanctity and historic issues related to the Walnut Hills Cemetery are resolved at Town Meeting, the Board would support FAVORABLE ACTION on Warrant Article XI, subject to safeguard conditions related to: noise, maintenance and long term appearance of the structures, fencing, landscaping (including size and type of plant material), access path (including width, location and paving material), and lighting.

The majority of the Planning Board believes that this proposal for Walnut Hills Cemetery is the lesser of two evils when weighing the aesthetic impact of this proposal versus the one for the Putterham Shopping Center and that this site would provide the best cell coverage for South Brookline. However, they felt that Town Meeting should decide the issues surrounding any impacts to the sanctity and historic nature of the cemetery. They acknowledged the feelings of those who are very opposed to the Putterham Shops location and expressed respect for those who have been involved in cell regulations in the Town since their inception.

Several good questions were raised during the hearing regarding how the tower and equipment would look and how their appearance would be maintained over time, and the Board requested that before Town Meeting, more graphic representations and more details about materials for screening, etc. should be provided. Additionally, the majority of the Board felt that their charge for the Planning Board with respect to cell towers has always been the aesthetic issue and not legal ones, and they noted that the approval process which requires approval by the Selectmen and Town Meeting is much more stringent than the Board of Appeals process. The process for this warrant article, while not perfect, has been good and has and will involve much public participation through the various committees, at least seven, who will vote on recommendations for this proposal at a public meeting or hearing.

The issue of a cell tower on Town-owned land is not new to Brookline. In 1999, Town Meeting discussed a proposal to locate a cell tower at the Putterham Meadows Golf Course. The proposal was ultimately rejected by Town Meeting. Below is a brief history of cell towers in Brookline:

- **1996** = Federal Telecommunications Act
- **May, 1997** = Town Meeting approval of a moratorium on antenna permits through November 26, 1997. (Article 16)
- **June, 1997 – October, 1997** = Antenna Zoning Sub-Committee, consisting of two Planning Board members and concerned citizens, worked to formulate a by-law.
- **November, 1997** = Town Meeting approval of the addition of a Wireless Communications section to the Town's Zoning By-Law. (Article 10. Article 11 was a citizen proposal that did not pass.)
- **January, 1999** = RFPs for a cell tower on Town-owned property is issued.
- **February – March, 1999** = RFP responses received and reviewed.
- **June, 1999** = Planning Board review of proposed 100' monopole at the Municipal Service Center (MSC).
- **July – August, 1999** = negotiations with Omnipoint for a monopole at the MSC.
- **September, 1999** = decision to postpone negotiating with Omnipoint until TM discusses proposal for "stealth" tower in the woods at the Putterham Meadows golf course.
- **November, 1999** = TM votes No Action on a "stealth" tower at the golf course (Article 11).

This past Spring, the Board discussed establishing a committee to explore long-term options regarding wireless technology, for a number of reasons:
- concerns raised by the Police and Fire Chiefs regarding the gaps in the wireless public safety network
- an increasing number of complaints received by the CIO regarding the lack of cell phone coverage in So. Brookline
- the possibility of taking advantage of "wi-fi", and
- future wireless applications for the schools and town departments.

At the same time, we began receiving numerous letters and emails from neighborhood residents objecting to the proposal for two cell towers at Putterham Circle. The residents did not want the towers located there - - as evidenced by the petition signed by more than 200 Brookline residents - - so they asked the Board at separate meetings in June to independently investigate potential locations that could address the issues.

The Board of Selectmen responded quickly by authorizing a competitive bid process. The Chief Procurement Officer then immediately convened a Selection Board to develop an RFP and review the responses to that RFP. Included in the Selection Board were four residents, three of whom are Town Meeting Members, and four Town Department Heads. Three of the Department Heads (Fire Chief, Recreation Director, and Commissioner of

A Moderator's Committee provides the Town the time necessary to review alternatives and have a warrant article on the Warrant for the 2005 Annual Town Meeting, if necessary. Therefore, the Board of Selectmen recommends FAVORABLE ACTION, by a vote of 4-0 taken on October 26, 2004, on the following vote:

VOTED: To refer Article 11 to a Moderator's Committee for report to the 2005 Annual Town Meeting.

**ROLL CALL VOTE:**
Favorable Action
Geller
Hoy
Sher
Merrill

--------------

## ADVISORY COMMITTEE'S RECOMMENDATION

BACKGROUND
This article comes to us because of a lack of cellular communications coverage in South Brookline that has existed for some time. Recently however, concerns by the Town's Public Safety Services (a number of police communication capabilities are unavailable in S. Brookline), specific requests by large numbers of South Brookline residents, and an undesirable plan by a private developer to locate twin antennae towers atop the shops at Putterham Circle in very close proximity to homes, indicates it is time to comprehensively address this issue. The residents specifically asked the Town to find an alternate viable site on Town property to locate telecommunications antennas in the area.

After hearing from these residents, and listening to the concerns of the Police and Fire Chiefs, the Board of Selectmen authorized the Town's Chief Procurement Officer to convene a working committee of Town staff and citizens to issue and evaluate a public RFP [request for proposal] for siting a communication facility(s) on Town-owned property. The Committee issued the RFP specifying it consider all Town-owned properties with four examples given: the DPW garage, Fire House #6, the Putterham Golf Course, and the Walnut Hills Cemetery.

Cellular communication providers (Verizon, Cingular etc.) and telecommunication facility siting companies evaluated the South Brookline area through radio frequency testing and mapping. As a result of their testing, the area's natural topography and the specified goals in the RFP (achieve maximum coverage while minimizing negative neighborhood impacts, including disruption and visual aesthetics) three of the five RFP responses indicated the Walnut Hills Cemetery as the optimal choice. The first choice of the other two respondents was Putterham Golf Course.

stipulates a $50K annual base plus 15% of the five co-location charges with a 3% escalation in fees. This translates to approximately $700K to the Town over the term of the lease. This fee structure appears to be well within the range of the "going rate". While $700K is not an insignificant sum, the potential financial gain to the Town is not the prime motivator for siting telecommunications equipment on Town property. Rather, it's the issues of adequate coverage and community control.

Site Sanctity, Process and Passion
The process to determine a site was a direct response to the concerns of the Public Safety Chiefs and the public, and has been commendable in many ways. A working committee of staff and residents, using a public RFP process, was a thoughtful approach. It's a mechanism that requires the consideration of things other than simply money in evaluating proposals. Even so, the process has thus far been short and narrow.

The cemetery Trustees have, appropriately, taken a position pursuant to their role as guardians of the cemetery. They, and others, feel that siting a cell tower within the confines of a cemetery is a fundamental breech of the area's sanctity. Others maintain that it is *how* it's sited, not merely *that* it is sited there. Indeed, churches and cemeteries around the country have elected to install towers on their property. There is disagreement among both the laity and clergy on this sensitive issue. It is a very personal assessment, but bear in mind how deeply some hold these feelings.

The Preservation Commission also does not support this site. It points out that the Walnut Hills Cemetery is listed on the Register of National Historic Sites and that any move to put a cell tower here would trigger a Federal review process. They also feel that the monopine would tower over the cemetery like an ominous sentinel. Though it should be pointed out, that from most of the cemetery's rolling wooded grounds, the monopine would not be seen.

There are also the issues of the potential uses of the knoll and proximity of the proposed tower to the old receiving tomb. Currently the knoll is unused, and being rock ledge it is unsuitable for full body internments. It may be feasible to use it in some way for the internment for ash however. The receiving tomb is a low-slung handsome granite structure that is seldom used. The cemetery Master Plan specifically contemplates a possible future use of the tomb either as a crypt or reception center (currently attached to the caretaker's house). The Trustees have mentioned they may wish to place a columbarium and/or chapel in this area as well and that an adjacent tower would compromise the contemplative nature of those uses. The cemetery Trustees' landscape architects Walker/Kluesing Design Group states in a letter submitted by the Trustees the concept of a columbarium at this site "was not discussed in the Master Plan for the cemetery because it wasn't necessary to illustrate development beyond a 30-40 year time span". How long, or if, it may be until this area is needed is beyond the Committee to determine.

There are two points worth making relative to this however. First, the tower lease (by law) is for a maximum of ten years. After that, Town Meeting can have the lessee



Town Owned Properties in South Brookline

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only)  Omnipoint Holdings, Inc. v. The Town of Brookline

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local
   rule 40.1(a)(1)).

   [ ]  I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

   [X]  II.   195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121
              740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.            for patent, trademark or copyright cases

   [ ]  III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
              315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
              380, 385, 450, 891.

   [ ]  IV.   220, 422, 423, 430, 460, 480, 490, 610, 620, 630, 640, 650, 660,
              690, 810, 861-865, 870, 871, 875, 900.

   [ ]  V.    150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this
   district please indicate the title and number of the first filed case in this court.

   _____

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                          YES [ ]      NO [X]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC
   §2403)
                                                          YES [ ]      NO [X]

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                                          YES [ ]      NO [ ]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                                          YES [ ]      NO [X]

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of
   Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

                                                          YES [X]      NO [ ]

   A.    If yes, in which division do all of the non-governmental parties reside?

         Eastern Division [X]        Central Division [ ]        Western Division [ ]

   B.    If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies,
         residing in Massachusetts reside?

         Eastern Division [ ]        Central Division [ ]        Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes,
   submit a separate sheet identifying the motions)

                                                          YES [ ]      NO [ ]

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME    William A. Worth, Esq. (BBO# 544086); Ricardo M. Sousa (BBO# 565043)
ADDRESS    Prince, Lobel, Glovsky & Tye LLP, 585 Commercial St., Boston, MA 02109
TELEPHONE NO.    (617) 456-8000

                                                                    (CategoryForm.wpd - 2/15/05)

%JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS The Town of Brookline, Town of Brookline Board of Appeals and Diane R. Gordon, Bailey S. Silbert and Enid M. Starr |
|---|---|
| Omnipoint Holdings, Inc. | |

**(b)** County of Residence of First Listed Plaintiff ___(Rhode Island)___
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant ___Norfolk___
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number) (617) 456-8000
William A. Worth; Ricardo M. Sousa; Prince, Lobel, Glovsky & Tye LLP, 585 Commercial St., Boston 02109

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
47 USC s. 332(c)

Brief description of cause: Unlawful denial in violation of 47 USC s. 332(c) by the Town of Brookline Board of Appeals of plaintiff's application for a special permit

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE April 1, 2005

SIGNATURE OF ATTORNEY OF RECORD _(signature)_

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG JUDGE _____